THOMAS BOYD v. MERRITT E. CONKLIN ET AL.

*Judicial knowledge—Flooding lands.*

1. Courts will take notice of the recital in public statutes of the time when a turnpike was laid out and built by the general government, and of the fact that it afterwards became subject to State authority and went into the charge of the ordinary town officers.

2. The maxim "Sic utere tuo alienum non lædas," applies to adjoining owners of land, each of whom must respect the valuable rights which accrue to the other from the relative situation of their lands, *e. g.,* in respect to the flow of surface water from one upon the other.

3. A rural land owner has no right to put up such artificial barriers as will flood his neighbor's land with water that would otherwise escape over his own, for the mere purpose of reclaiming the bed of a pond that has always been on his premises, and of getting rid of the inflow.

| | |
|---|---|
| 54 | 583 |
| 64 | 41 |
| 54 | 583 |
| 95 | 589 |
| 54 | 583 |
| s20NW | 595 |
| s52AR | 831 |
| 130 2 | 5 |
| 54 | 583 |
| s20NW | 595 |
| 131 | 2389 |
| 54 | 583 |
| e137 | 2343 |
| 137 | 516 |
| 54 | 583 |
| 140 | 2624 |
| 54 | 583 |
| f150 | 2527 |
| 54 | 583 |
| 155 | 610 |

Error to Lenawee. (Howell, J.) June 24.—Sept. 23.

TRESPASS. Plaintiff brings error. Affirmed.

*A. L. Millard* and *Bean & Underwood* for appellant. No one can insist that surface water gathering on land shall be permitted to run into or through the lands of an adjoining proprietor : *Luther v. Winnisimmet* 9 Cush. 171; *Bates v. Smith* 100 Mass. 181; *Curtiss v. Ayrault* 3 Hun 487; *Dickinson v. Worcester* 7 Allen 19; *Goodale v. Tuttle* 29 N. Y. 459; *Flagg v. Worcester* 13 Gray 601: Cooley on Torts 575; *Barkley v. Wilcox* 86 N. Y. 140; *Cairo & Vicennes R. R. v. Stevens* 73 Ind. 278; the owner of land adjoining a highway can build an embankment on his own land to prevent the surface water from flooding it from the highway, even though it injures the highway: *Franklin v. Fisk* 13 Allen 211; *Murphy v. Kelley* 68 Me. 521; the length of time surface water has been accustomed to run in a particular channel makes no difference: *Pettigrew v. Evansville* 25 Wis. 223, 228; *Parks v. Newburyport* 10 Gray 28; *Hoyt v. Hudson* 27 Wis. 656; a land-owner may turn back the overflow of a stream as well as surface water produced by rain or snow: *Taylor v. Fickas* 64 Ind. 167; neither highway commissioner nor township board have any authority (with certain excep-

tions not applying to this case), outside the highway, and are trespassers if they interfere with property beyond its limits : *Ashley v. Port Huron* 35 Mich. 296 ; *Elder v. Bemis* 2 Met. 599.

*C. A. Stacy* for appellee. To destroy, stop up or divert the course of an ancient highway is a nuisance at common law : Angel on Highways § 224 ; *Rex v. Ward & Lynn* Cro. Car. 266 ; *Rex v. Flecknow* 1 Burr. 465 ; *Weathered v. Bray* 7 Ind. 706 ; any one may abate of his own motion such a public nuisance : *Wetmore v. Tracy* 14 Wend. 250 ; *Hart v. Albany* 9 Wend. 571 : 3 Paige 213 ; Angel on Water-courses §§ 390, 392 ; *Arundel v. M'Culloch* 10 Mass. 71 ; *Pierce v. Dart* 7 Cow. 609 ; *People v. Carpenter* 1 Mich. 289 ; *Carpenter v. Mann* 17 Wis. 155 ; a superior land-owner can improve his lands by throwing increased waters upon his inferior through the natural and customary channels : *Kauffman v. Griesemer* 26 Penn. St. 408 ; *Porter v. Durham* 74 N. C. 769 ; *Martin v. Riddle* 26 Penn. St. 415 ; *Miller v. Lanbach* 47 Penn. St. 154 ; *Gillham v. Madison R. R. Co.* 49 Ill. 484 ; *Gormley v. Sanford* 52 Ill. 160 ; *Ogburn v. Connor* 46 Cal. 346 : 13 Am. Rep. 213 ; *Acton Blundell* 12 M. & W. 324 ; *Butler v. Peck* 16 Ohio St. 334 ; *Tootle v. Clifton* 22 Ohio St. 247 ; *Mason v. Hill* 5 B. & Ad. 1 ; *Bellows v. Sackett* 15 Barb. 96 ; *Nevins v. Peoria* 41 Ill. 562 ; *Rudd v. Williams* 43 Ill. 385 ; *Laumier v. Francis* 23 Mo. 181 ; *Livingston v. McDonald* 21 Iowa 160 ; *Hooper v. Wilkinson* 15 La. Ann. 497 ; *McCormick v. Kansas City R. R. Co.* 70 Mo. 357 ; *Shane v. Kansas City R. R. Co.* 71 Mo. 237 ; *Earl v. DeHart* 12 N. J. Eq. 283 ; Washburn on Easements 355.

CAMPBELL, J. Boyd sued defendants for removing part of a dam which he had built across the outlet which drained an adjoining highway and higher lands adjacent. Lorenzo D. Dewey owned a farm running north of the highway about half a mile, and a swale ran through this land from north to south which crossed the road through a culvert from which the water flowed across Boyd's farm to a pond on his land which has no surface outlet. The swale is crossed by an old beaver dam near its north end, and a creek called Evans' creek, a little to the north of it, sometimes overflows so that the water runs over this beaver dam into the swale. The swale carries down all the surface water on Dewey's land, and there

was testimony tending to show that it was partly fed by springs, although this was disputed. Both farms are enclosed by a ridge which prevents any water passing from Dewey's land from escaping except through the swale and into the pond, and there is no other way of draining the highway. The soil is clay except to the south and east of the pond where it is gravelly, and where there is some escape of water by percolation, and possibly by a subterranean outlet. Both farms seem to have been in private hands for above fifty years. The road appears by the testimony to be the La Plaisance Bay turnpike, which was, as we are judicially informed by public statute, laid out in 1832, and built by the United States government, and subsequently became subject to State authority and is now in charge of the ordinary town authorities. Just north of the road (which runs east and west on the section line between sections 32 and 29, in township 5 south of range 4 east) the swale widens on Dewey's land into a small pond. The pond on Boyd's land is never dry, and before he built the dam contained usually from six to eight acres, of which a space of several acres became dried by means of the exclusion of the water which came down from the lands above, which had no other escape. The dam was a solid structure twelve feet thick at the base and seven on the top, about a hundred paces long, and higher than the highest part of the culvert or highway. Its effect was to submerge the road, and also to throw the water all back over the highway and upon Dewey, where it had no escape but by evaporation.

Boyd purchased the farm which contains a little over ninety acres, in 1872, at which time there was no obstruction to the flowage. He first built the dam in 1877, and it was removed so as to give room for the water in 1878 by the highway commissioner. Being rebuilt, it was removed in 1879 by defendants, under the direction of the local authorities, Conklin himself being commissioner and acting in pursuance of their instructions.

The case, as it is now before us, presents no complications. The dam was built for the sole and express purpose of shut-

ting out the water, which had its only outlet through the swale and over Boyd's land, and this was its original and natural outlet. It was not artificial but had always existed since the country was known; and the existence of a beaver dam makes it not unlikely that it was once a running stream. Whether its waters are to any extent from springs or not, they include the whole surface drainage, and are not confined to passing storms. There is some testimony of occasional attempts by the lower owners to obstruct the water, but no evidence of acquiescence, and very little, if any, of submission by the highway authorities to such obstructions.

If this had been an artificial drainage, the long existence of the road, which could not be kept in repair without drainage, and the undisputed fact that a regular culvert has existed at least since 1845, and that no other drainage was possible, would in our opinion put plaintiff to very strong proof to overthrow the presumption of right. The court below gave plaintiff the benefit of that analogy, and going very far in the endeavor to avoid giving occasion for cavil, limited defendant's justification to a substantially uninterrupted enjoyment of the drainage for twenty years without substantial objection to the public or highway authorities. But plaintiff insists that his right to intercept surface water cannot be cut off in that way, and that except in case of living waters in a defined and regular channel, there is no such obstacle, or none without such an undisputed prescriptive right as would be equivalent to a grant.

On the argument the whole subject was discussed with much ability. It is not necessary, however, to consider any more of the legal theories than such as have some application on the facts.

The real question here was whether one landowner can at his pleasure erect such barriers as will flood his neighbor's land with water that otherwise would escape over his own, in order to partially or wholly reclaim the bed of a pond which has always existed there, and get rid of the inflow. In its natural condition neither the highway nor the upper

lands would be drowned. The effect of the dam is to cover portions of them with water that cannot escape.

It was urged strenuously on plaintiff's behalf that there is a radical difference between the common and the civil law upon the subject of the relations of upper and lower estates as to water easements and servitudes, and that at common law the latter owes no service to the former in regard to the flow of surface water. As we are not expected officially to be experts in the civil law, we shall not attempt to discuss that department of jurisprudence as a separate subject. But it so happens that from the time of Bracton down attention has been frequently called by the common-law courts to the fact that the whole subject of rights in water has been defined by the civil-law writers in terms which substantially agree with the recognized rules of the common law, and that they agree very closely, not necessarily because one has been borrowed from the other, but rather because both are naturally drawn from the general usages and necessities of mankind. All of the considerations which belong to the present case depend on the reciprocal action on both upper and lower proprietors of the maxim that every man, in the use of his own property, must avoid injuring his neighbor's property as far as possible. And while the cases cited on the hearing show that courts have sometimes indulged in sweeping language that taken independently would lead to remarkable results, the facts on which the apparently conflicting rulings rest greatly narrow their substantial repugnance. There are, it must be admitted, decisions that cannot possibly be harmonized. But their number and their force do not equal their apparent importance. And there is no subject on which local usages have had so much weight in shaping the local common law as the incidents of real estate. There are parts of the Union where the land laws have always differed from the common law of other states, while the law relating to water has been laid down in a large part of the United States in a uniform manner, without reference to their ancient condition as French, Spanish or English colonies. The civil-law definitions, or what are supposed to be such, are quoted

:as often under the one class of antecedents as under the other.

The chief differences pointed out on the argument, as important in weighing decisions as furnishing precedents, related to distinctions between living streams in a natural flow, and water of a different character in artificial escapes or in surface descents, — to distinctions between urban and rural servitudes, — and to the purposes for which dams or other interruptions are made.

It is not disputed that perennial flowing streams of living water impose similar duties and confer similar rights on all riparian proprietors under all systems of jurisprudence. It is not disputed that under what is claimed to have been the civil-law rule, the rural proprietor of lower lands was required to receive the water flow of surface water from the upper lands coming in substantially its natural amount and condition. Beyond this we cannot harmonize much of the contention of counsel, and must dispose of the case as it appears to us.

A number of the most striking cases cited by plaintiff's counsel in support of his appeal, as laying down the broadest doctrine, and as relied upon in a good share of his other citations, were cases where the lands were in towns and cities, and the erections or acts in litigation referred to the uses of that class of property. And in relying on these it was claimed that there was no substantial foundation for any distinction between urban and rural property.

There is no question but that such a distinction is recognized in the civil-law authorities referred to on the argument, as well as in several of the cases cited. The distinction is one of substance and not arbitrary. As already suggested, the adjoining owners owe mutual duties,—the one to receive the natural flow, and the other not to injuriously change its conditions. It is obvious that the laying out of town streets and the multiplication of buildings cannot avoid making serious changes in the surface of the ground and in the condition of surface water. Grades must usually be established for streets and sidewalks, and pavements and other surface

changes are usual, in addition to the walls of buildings which, with their embankments, must obstruct or change the drainage. It is almost universally expected and provided that sewerage and drainage shall be regulated by some municipal standard. There cannot be towns without changing the face of the land materially. And where the same rule has been applied to towns as to the country, it has in some cases at least, been done expressly, because in the circumstances of the record the particular land in question had remained under rural conditions. If—as seems to be true—some decisions ignore the distinction, they depart from the old rule, and cannot be maintained as harmonious with the general line of authority, unless on special facts which do not justify their broad dicta.

The Massachusetts cases lay down so broadly the right of the lower proprietor to cut off the water flowing down on him, that whatever distinctions may be found in their facts, the court evidently meant to disregard them. The Wisconsin cases perhaps go about as far, and the Indiana rule is stated in similar terms. It can hardly be said that there is any fixed New York rule which would apply to such a case as the present. In the case of *Barkley v. Wilcox* 86 N. Y. 140, where the interference with the water was by building and banking up a house near a street, the facts did not call for any very general discussion, and the court, while expressing a preference for the views of the Massachusetts courts over the rule in Pennsylvania and other states to the contrary, saw the necessity of caution in adopting those views too universally, and left the door open to deal with cases like this on their own footing. In *Bowlsby v. Speer* 2 Vroom (N. J.) 351, the facts and the decision were like those in *Barkley v. Wilcox*, but can hardly be said to disturb the earlier case of *Earl v. De Hart* 1 Beasl. Ch. 280, where the civil-law principle was treated as in some cases furnishing a proper rule for town property which was not so situated as to require a different treatment.

Mr. Washburn, in his treatise on Easements (p. 355), indicates that the Massachusetts rule is not sustained by the weight

·of American authority, and that the rule known as the civil-
law rule has been more generally accepted.  He cites most
of the authorities brought to our attention on the argument,
.and they unquestionably · sustain the existence of duties
between the respective land-owners to do no harm to each
·other against the natural servitude.

Much of the discussion found in the cases referred to turns,
·not on the right of the upper owner to have egress for his
water, but upon the right of the lower owner to have the
water come down.  In the present case, Boyd does not seem
to desire this supply.  But it is quite supposable that, if
this pond were not entirely on his premises, it might be of
some importance to the neighboring land that it should not
be diminished or destroyed.

It is not necessary on this record to determine how far
·defendants could themselves have shut off the supply, because
it is evidently not for their interest to do so.  But there is
no lack of cases which hold that rights may exist in a flow
·of water which is not a natural living stream.  And while
here, as in other cases, the rights of parties must depend
.somewhat on the circumstances and surroundings, the general
principle underlying all the cases is that the upper and lower
·owners must respect any valuable rights which accrue to either
from the position of their lands.  The narrow definition of
water-courses as natural living streams, which appears in a
few cases in the United States, is not an ancient or universal
definition.  On the contrary, water running in a natural or
·artificial bed is very frequently, if not generally, so regarded.
But names are of small importance, inasmuch as the only con-
sideration that need be looked at is the character and surround-
·ings of the flowage.  The following authorities recognize
valuable rights in water, and some of them are spoken of
·expressly as water-courses, which are entirely distinct from
natural living streams.  Woolrych on Waters 3, 146–7 ;
*Wright v. Williams* 1 M. & W. 77 ; *Rawstron v. Taylor*
11 Exch. 369 ; *Broadbent v. Ramsbotham* 11 Exch. 602 ;
*Beeston v. Weale* 5 El. & Bl. 986 ; *Ivimey v. Stocker* L. R.
.1 Ch. App. 396 ; *Watts v. Kelson* L. R. 6 Ch. App. 166 ;

*Nuttall v. Bracewell* L. R. 2 Exch. 1; *Holker v. Poritt* L. R. 8 Exch. 107; *Taylor v. Corp. of St. Helen's* L. R. 6 Ch. Div. 264; *Magor v. Chadwick* 11 Ad. & E. 571; *Chadwick v. Marsden* L. R. 2 Exch. 284.

Upon such questions as are raised on this record there is, except in the Massachusetts doctrine and the cases which have followed it, very little conflict of opinion. Whatever may be the rights of adjoining proprietors as to the use and diversion of water, there is no right in any one, by raising artificial obstructions, to flood his neighbors' lands, by stopping the escape of water that cannot escape otherwise. Some cases have intimated that there might be larger rights of obstruction where the particular drainage was not necessary. But actual mischief done as a natural and necessary consequence of such erections is almost universally treated as an actionable nuisance. *Lawrence v. G. W. R. Co.* 16 Q. B. 643; *Rylands v. Fletcher* L. R. 3 H. L. 330; *Tootle v. Clifton* 22 Ohio St. 247: Wood on Nuisances § 386; *Hurdman v. N. E. Rw. Co.* L. R. 3 C. P. Div. 168; *Whalley v. Lancashire & Yorkshire Ry. Co.* L. R. 13 Q. B. Div. 131; summarized in 30 Alb. L. J. 3; *Broder v. Saillard* L. R. 2 Ch. Div. 692; *Gillham v. Madison Ry. Co.* 49 Ill. 484; *Gormley v. Sanford* 52 Ill. 158; *Ogburn v. Connor* 46 Cal. 346; *Butler v. Peck* 16 Ohio St. 334; *Nevins v. City of Peoria* 41 Ill. 502; *Livingston v. McDonald* 21 Iowa 160; *Hooper v. Wilkinson* 15 La. Ann. 497; *McCormick v. Kansas City R. R.* 70 Mo. 359; *Shane v. Kansas City Ry.* 71 Mo. 237.

As previously suggested, the rights of upper and lower owners are not treated by the common-law authorities as peculiar to either common or civil law, but as natural incidents to the land, which are and must be analogous as governed by universal jurisprudence, except where specially modified. The English courts have never hesitated to cite the civilians on such questions, and they have decided cases arising out of England without attempting to inquire into any local law as the basis of decision. Thus, in the East Indian case of *Rameshur Pershad Narain Singh v. Koonj Behari Pattuk*

L. R. 4 App. Cas. H. of L. 121, the rights of the parties were dealt with just as if they had arisen in England, although the uses of tanks and reservoirs in India must in all probability have grown into very ancient customs. In *Smith v. Kenrick* 7 C. B. 715, the Digest was cited as authority. In *Dickinson v. Grand Junction Canal Co* 7 Exch. 282, and in *Embrey v. Owen* 4 Eng. L. & Eq. 466, it is stated that these various rights are not to be regarded as based on any presumption of grants, but as incidents to property jure naturæ. Bracton is cited in Wood on Nuisances § 386, as coinciding with the civil-law rule. While he has been regarded as drawing too much from the Roman law in some other matters, no one has doubted that he laid down the common law correctly on this. Britton lays it down very clearly that no one can drown his neighbor's land, by erections on his own soil. "Appurtenances," fol. 140. The civil-law rule was recognized and adopted in the customary as well as in the written law in parts of France, and in Canada and Scotland; and the Roman law in all these regions was modified by local usage, and in many things repudiated. In Basnage's Commentary on the Custom of Normandy it is not treated as a civil-law rule, but as a law of nature. 2 Basnage, 565. In *Frechette v. La Compagnie Manufacturiere De St. Hyacinthe* L. R. 9 App. Cas. H. of L. 170, the Lower Canada Code is quoted, which seems to be a substantial if not a literal transcript of section 640 of the French Civil Code, and regulates the rights of both classes of owners, forbidding the lower owner from hindering the escape of water by dikes, and forbidding the upper owner from aggravating the flow to the injury of the lower estate. In discussing this clause, a learned writer on the law of property, Charles Comte, speaks of the term "servitude," which strictly denotes a diminution of rights, as an unfortunate and improper phrase to apply to these reciprocal duties. "It is simply a means of preventing usurpation, and of securing to each that which belongs to him." While Erskine in his "Principles of the Law of Scotland," uses the term "servitude" as including the rights in question, he speaks of them as natural, as contradistinguished from legal

servitudes. Book 2, title 9. Domat refers to them in the same way, dividing servitudes into those which are natural, and those which do not rest on natural right. Book 1, tit. 12, § 5. And this is further illustrated by his collection of excerpts from the Roman law. 4 Domat 423.

There seems to be no reason for attempting to draw distinctions between the civil and the common law on this subject. The authorities recognize the principles as in no sense conventional, or derived from any school of jurisprudence, but as resting on the immunity of one man's property from injury by another in violation of natural justice and in disregard of the relative conditions arising from its position. Each may do in using his own what is consistent with the fair interests of the other.

The escape of water in the present case is natural and is necessary, and there was no right to prevent it by such a dam as defendants broke through. The charge given was at least as liberal as plaintiff had a right to ask.

The judgment should be affirmed.

CHAMPLIN and SHERWOOD, JJ. concurred. COOLEY, C. J. did not sit.