O'CONNOR *v.* HOGAN.

1. WATERS AND WATERCOURSES—SURFACE WATERS—DIVERSION—OBSTRUCTION.

Where a landowner unlawfully diverts from their natural course and casts upon his neighbor surface waters in addition to those which naturally flow in that direction, the lower proprietor has a right to protect himself from such additional flow though in so doing he necessarily obstructs the waters which naturally flow upon his land and which it is his duty to receive.[1]

2. SAME—PLEADING—GENERAL ISSUE—DEFENSES AVAILABLE.

Where the declaration alleges that defendant obstructed either a natural water way or a water way gained by prescription or adverse user, it is competent for defendant to

---

[1] For rights as to flow of surface water, see note to *Gray* v. *McWilliams* (Cal.), 21 L. R. A. 593.

show, under the general issue, without special notice, that the water way which he obstructed was made by the unlawful act of plaintiff.

3. SAME—DAMAGES—EVIDENCE—SUFFICIENCY.

In an action for the unlawful obstruction of a water way, testimony of plaintiff that he told another that the water was doing a lot of damage to him, and more to defendant, because it ran over the latter's lands more than on plaintiff's, sufficiently showed that the water was an injury to defendant.

4. EVIDENCE—RES INTER ALIOS.

A settlement of a controversy between plaintiff and a township board arising out of a flowage of surface water, in which plaintiff agreed to permit the water to flow in the natural channel across his farm, thence across defendant's, made in defendant's absence, is not binding on defendant, and does not determine the natural channel of the water as between plaintiff and defendant.

5. WITNESSES—IMPEACHMENT—COMPETENCY OF EVIDENCE.

On an issue as to the direction of the natural flow of surface waters, a witness, who had been highway commissioner, testified to a conversation between plaintiff and defendant in which defendant stated, without protest from plaintiff, that the water always went west. A few weeks after the alleged conversation a controversy between plaintiff and the township, arising out of the flowage of water, was settled in the witness' presence by an agreement which recited that plaintiff would permit the surface water to flow in the natural channel east across defendant's farm. *Held*, that the witness was not called upon at the time of the settlement to repeat the statement of what he had heard said in the conversation some weeks before, and the fact that he did not say anything, as evidenced by the terms of the settlement, was not an impeachment of his testimony to the conversation.

6. APPEAL—CURE OF ERRORS—EXCLUSION OF TESTIMONY—SUBSEQUENT ADMISSION.

The exclusion of a question asked of a witness, *held* cured by permitting the excluded question to be put to other witnesses.

7. TRIAL—INSTRUCTIONS—ERRONEOUS HYPOTHESIS.

A request to charge that the undisputed testimony showed that certain waters flowed west, etc., was properly refused where there was evidence that a portion of the waters, at least, flowed east.

8. SAME—INSPECTION OF PREMISES—VIOLATION OF STIPULATIONS.
    The fact that plaintiff's attorney went to the premises in ques-
    tion in violation of a stipulation that the jury alone should
    visit and view the premises was not ground for new trial,
    where he did not go or come with the jury, nor see or con-
    verse with any of them, and it was not claimed that he had
    anything to do with the jury or influenced them in any way.

Error to Ionia; Davis, J.   Submitted May 2, 1905.
(Docket No. 86.)   Decided June 29, 1905.

Case by James O'Connor against Patrick Hogan for the
obstruction of a drain.   There was judgment for plaintiff,
and defendant brings error.   Reversed.

*John Nichol* and *George E. & M. A. Nichols*, for ap-
pellant.

*A. A. Ellis*, for appellee.

BLAIR, J.   Plaintiff sued defendant in an action on the
case to recover damages for alleged unlawful acts of
defendant in obstructing and interfering with the drain-
age of plaintiff's lands.   The declaration charges in the
first count:

"That for more than twenty years  *  *  *  water
which has run from adjacent lands upon the said land
of the said plaintiff, and water which has accumulated
from storm and other natural causes, has been carried and
drained therefrom through natural depressions or low land
onto and through the southeast quarter of the southwest
quarter of section fifteen,  *  *  *  and that from time
immemorial, and for more than twenty years before the
committing of the grievances hereinafter stated, the sur-
face waters in times of freshet and at all times of high
water flow, by reason of the natural depressions of the sur-
face of the soil, through and along a drain or low ground
from the lands of this plaintiff onto and through the lands
of said defendant, thereby securing to this plaintiff suffi-
cient and proper drainage of surface water for his lands;
and this plaintiff claims that by reason of the use of a pas-
sageway on said southeast quarter of the southwest quar-
ter, and the use thereof for the purpose aforesaid for more

than twenty years before the committing of the grievances herein stated, he has a lawful easement and right of way across the said lands of the said defendant above described, for the purpose of draining the waters so accumulating upon the lands of the said plaintiff through and across the lands of the said defendant.    *    *    *

"Nevertheless the said defendant, well knowing the premises, on, to wit, the 1st day of June, 1895, and at various other dates between that date and the commencement of this suit, at or near a point where said water naturally passed over and from the lands of this plaintiff onto and over the lands of the said defendant, the said defendant, by means of certain obstructions of sod and stones thrown, put, and laid along, by and in the place where said water was wont to flow in high-water times and in times of rain onto the lands of the said defendant from the lands of this plaintiff, created a dam or obstruction in said waterway, and wrongfully and unjustly obstructed the surface water from passing over said low lands through its natural water way in its ancient channel or course onto and over the lands of the said defendant, and thereby purposely caused said surface water to back up, lie, and remain on the lands of the plaintiff."

The second count contains the following allegations:

"And whereas from time immemorial there has been a natural depression across said above-described lands, creating a natural water way for surface waters, extending therefrom onto and over the lands of the said defendant, known and described as the southeast quarter ($\frac{1}{4}$) of the southwest quarter ($\frac{1}{4}$) of section fifteen (15), town eight (8) north, of range five (5) west; that in times of freshet or high water, from time immemorial, the waters from the lands of this plaintiff have been wont to flow through said natural water way from the lands of this plaintiff onto the lands of said defendant, and thence on and across said lands into a swamp or low piece of ground, easterly over the lands of the said defendant; that, by reason of the situation of the lands of this plaintiff, divers large amounts of surface water flowed from adjacent lands situated south of the lands of this plaintiff from and across the lands of this plaintiff, and on and over the lands of the said defendant above described; that said above-described water way also formed a natural watershed for a large portion of the lands of this plaintiff above described, and by reason of said

watershed the lands of this plaintiff were very valuable for agricultural purposes, and were used by this plaintiff for the raising of corn, wheat, and other valuable crops, and on, to wit, the 1st day of June, 1895, and for a long time prior thereto, the said defendant owned and occupied the lands above described, known as the southeast quarter of the southwest quarter of section fifteen, town eight north, range five west, and during all of the time aforesaid, by reason of the natural depressions of the surface of the soil, and a drain cut by the natural flow of the water, the surface waters on the lands of this plaintiff passed therefrom over and across the lands of the said defendant, thereby securing to this plaintiff a proper and sufficient drainage of the surface waters from his lands and such water as might accumulate thereon from adjacent lands, and this plaintiff claims that by reason of the use of a passageway on said southwest quarter, and the use thereof for the purpose aforesaid, for more than twenty years before the committing of the grievances hereinafter stated, he has a lawful easement and right of way across the said lands of the said defendant above described, for the purpose of draining the waters so accumulating upon the lands of the said plaintiff, through and across the lands of the said defendant; * * * that by reason of the large amount of water that had accumulated from adjacent lands, and also by reason of the water that flowed upon the watershed of the lands of this plaintiff, and their commingling together on the lower portion of the lands, and their passage on and over the lands of the said defendant, a ditch had been cut by the flow of the waters, which was lower than the surface of the adjacent lands, and through this run or ditch in times of high water or floods the water would pass off quickly, and do little or no injury to the lands of this plaintiff; that said above-described water way formed a natural watershed for a large portion of the lands of this plaintiff, and that by reason of said watershed the lands of this plaintiff were very valuable for agricultural purposes, yet the said defendant, well knowing the premises, but maliciously. intending to deprive the plaintiff of the use and profit of his said lands, and deprive him of his easement in the lands of the said defendant, on, to wit, the 1st day of April, 1895, and on divers other dates thereafter between that date and the commencement of this suit, obstructed and dammed the passageway for the said water over and through the lands

of the said defendant, which said dam was constructed by the said defendant in divers ways, to wit, the said defendant plowed or back-furrowed along the said drain so formed across the lands of the said defendant, and thereby filled up and dammed the same, and, instead of a drain, caused the surface of the land where the water had been wont to flow to be higher than the adjacent lands, and on, to wit, the 1st day of June, 1895, and on divers days thereafter, on the line between the lands of this plaintiff and the said defendant, where said water was wont to flow, placed sod, stones, and other obstructions, and dammed the passage of the said waters by plowing parallel with the line fence and across the water way, and refused to remove the same, threatened personal violence to this plaintiff should this plaintiff in any manner attempt to enter upon the lands of the said defendant and remove the said obstructions, and the said defendant continuously since the time aforesaid, up to the time of the commencement of this suit, obstructed said ancient watercourse or water way, at the county aforesaid, in the manner aforesaid."

Plaintiff is the owner of the southwest quarter of the southwest quarter of section 15 in the township of North Plains, Ionia county. Defendant is the owner of the southeast quarter of the southwest quarter of section 15. Plaintiff's 40 acres lie directly west of defendant's 40.

There is a highway running east and west on the south side of these lands, and to the south of this highway, or directly across the road to the south, are the lands of Matthew Behan. There is also a highway running north and south on the west side of the lands of plaintiff, and to the west of this highway are the lands of Thomas Cusick. There is a natural divide running north and south across the lands of the plaintiff, and the waters from rains and melting snows on the east of this divide have, without dispute, always flowed to the east onto and over the lands of the defendant. And the rains and melting snows accumulating on the west side of this divide have always flowed to the west and across the highway onto the lands of Thomas Cusick.

The lands of the plaintiff are also the watershed for 15 or 20 acres of the lands of Matthew Behan. The waters

from rains and melting snows accumulate on the lands of Matthew Behan, and flow across the road to the north onto the lands of the plaintiff, some distance west of the line between defendant and plaintiff. These waters have formed a gully at or near the highway which runs to the north and west onto the lands of plaintiff for a distance of 15 or 20 rods, where said gully reaches a level or a flat tableland on the top of the divide.

It was the contention of the plaintiff that, when the water reached this tableland in a state of nature, it flowed to the east onto and over the lands of the defendant; and it was the contention of the defendant that, when the water reached this tableland in a state of nature, it always flowed to the west, and onto the lands of Cusick, and that none of it came onto his lands, except rains and melting snows that naturally fell on the east side of this divide.

It also appeared in evidence and was conceded that in 1889 a ditch was dug along the highway to the west from where the waters crossed the road from Behan's land onto that of the plaintiff, and that a large portion of the water from the Behan land from the year 1889 until 1893 was carried west; that considerable of the water from the Behan land ran to the west for a period of four years; that in 1893 this ditch became filled up so that it threw the waters back onto the Behan land, and also was injuring the highway, and plaintiff was sued by the township. The case was finally compromised and settled between the plaintiff and the township, at which time, in 1893, he again opened the water way onto his own lands, and from that time on the water has flowed north through the old channel until it reached the divide on plaintiff's land, and thence east onto and over the lands of the defendant.

It was claimed by the plaintiff on the trial that all this water, after leaving his land, and when it reached the lands of the defendant, formed a natural ditch or water way at or near the line fence between them, which ran to

the east across the lands of the defendant, and that this waterway or ditch was 2 or 3 feet wide and 18 inches deep, and that defendant filled up this ditch or water way, and also placed stone and sod at the line fence between them, which formed a bank or dam which cast the waters back onto the lands of the plaintiff, and injured his crops.

On the other hand, defendant claimed that there was never any ditch or water way across his lands, and never had been, and that he did not make any dam or embankment at the line fence to throw the waters back onto the lands of the plaintiff, and that the waters from the Behan lands never had flowed from the divide onto his lands until after the year 1893, and that in the year 1893, or some time during the time the water had been running to the west through the ditch along the highway, plaintiff had plowed back-furrows, or by some other artificial means had raised and formed a ridge west of the mouth of this ravine, on the divide so as to throw the waters east onto his land, and that, if he did make any dam or embankment, he had a right to do so.

The jury rendered a verdict in favor of the plaintiff for nominal damages, and the defendant brings the case to this court for review upon writ of error.

The assignments of error relied upon by counsel for appellant for a reversal are:

*First.* That the court erred in refusing to give defendant's fourth and fifth requests to charge, and in his charge to the jury as to the subject-matter of such requests.

*Second.* That the court erred in permitting plaintiff to introduce in evidence a certain receipt attached to a justice's judgment against plaintiff and in favor of the township of North Plains.

*Third.* That the court erred in refusing to allow a witness, after having stated his examination and investigation of the locality in question, to express his opinion as to the course of water in a state of nature.

*Fourth.* That the court erred in refusing to charge that the period from 1889 to 1893 should be deducted in computing the time of adverse user.

*Fifth.* That the court erred in refusing to grant the motion for a new trial.

1. Defendant's fourth and fifth requests to charge were as follows, viz. :

" *Fourth.* If you find that the natural watercourse for the water from Behan's land, in a state of nature, was to the west, and not to the east, then I charge you that the plaintiff had no right by any artificial means to change the course of such water so as to throw it upon the lands of the defendant, unless he had acquired such right by user or prescription, as above set forth, and that if the plaintiff did flow upon the lands of the defendant waters from the Behan land which did not naturally flow upon defendant's land, if you find such to be the case, without having acquired the right so to do by user or prescription, then the defendant would have the right to obstruct the flow of such waters, either by erecting dams or otherwise, even if in so doing it would obstruct the flow of waters upon his land that naturally flowed in that direction, and if in so doing the plaintiff's crops were injured, and would by so doing not subject himself to any liability for damages to said plaintiff.

" *Fifth.* If you find that the natural watercourse for the waters from the Behan land was to the west across the plaintiff's lands, and upon Cusick's land, and that prior to 1889, when the ditch was constructed by plaintiff along the highway, such waters from the Behan land had always flowed across the lands of the plaintiff to the Cusick land, on the west, and that since that time said plaintiff had by artificial means changed the course of such Behan water, or a sufficient portion thereof to do damage, and flowed the same upon the lands of the defendant, then your verdict must be in favor of the defendant, of no cause of action."

These requests were refused by the court, and he instructed the jury, as follows :

" The plaintiff had the right, in the interest of good husbandry, and in the good-faith improvement and tillage of his farm, to fill up the sag holes so that no water would accumulate or stay on him, even if the water arising from rainfall or melting snow should thereby, in natural process, find its way in the natural watercourse upon the

land of the defendant, and incidentally increase the flow thereon; but he cannot, by artificial drains or ditches, cast the water from sag holes, basins, and ponds on his own lands over upon the proprietor below, to his injury; that is, where the natural flow does not go in that direction.

"If you believe from the evidence that the water from the plaintiff's land did not naturally drain from his land by a flowing upon the land of the defendant, but that he, by drains and by artificial means did drain the water from his own lands, and caused it to flow in unnatural quantities upon defendant's land, and that the defendant only stopped such unnatural flow by stopping the lower end of such ditches, or other means of drainage, to the extent of setting back this excess of water, then he is justified in so doing, and is not liable for such acts, provided you believe from the evidence that such drain had not existed before the acts complained of, and for this space of time that I have named—upwards of fifteen years."

We think that the court should have given the defendant's fourth request. While the charge of the court was technically correct, so far as concerned the right of the upper owner to fill up sag holes, etc., in the process of good husbandry (*Gregory* v. *Bush*, 64 Mich. 37), it was not applicable to the facts of this case, and might have had a tendency to mislead the jury. It was the primary claim of the plaintiff that a natural water way existed over defendant's lands "since the world was made." "It was not a dug ditch. It was a washed ditch. What I mean is a ditch made by the water." And he claimed that the waters from the south flowed through this natural water way or channel.

It was the primary claim of defendant, also, that there was a natural water way for the waters flowing from the south, but that it did not carry the waters easterly from the divide on plaintiff's lands over his lands, but westerly from the divide over onto the lands of one Cusick. It was the secondary claim of plaintiff that even though the waters, in a state of nature, flowed to the westward, and he had by artificial means caused them to flow to the east,

such flowage had been for a period of upwards of 15 years. It was the secondary contention of defendant that the waters had not flowed across him through the alleged water way continuously and uninterruptedly for a period of 15 years and upwards.

The request under consideration excludes from its operation the secondary claim of the parties, and is based solely upon their primary contentions. It asserts the legal proposition that one proprietor cannot divert a natural water way so that its waters shall be discharged upon his neighbor—a proposition which we regard as clearly correct, and which was probably so regarded by the learned trial judge. Doubtless the trial court refused the request for the reason that it stated the law to be that in case of such diversion of the water way the defendant would have the right to obstruct it, even if in so doing he "would obstruct waters upon his land that naturally flowed in that direction" since it was the opinion of the court, as shown by his instructions to the jury in that regard, that the defendant's right in such case would be limited to obstructing and preventing the flow of the excess waters.

We cannot agree with this view, as applied to the facts of this case. The main controversy in the case was over the course and disposition of the waters flowing from Behan's lands upon the south after they reached the divide upon plaintiff's lands. There was no dispute that the waters which fell upon plaintiff's lands east of the divide flowed easterly somewhere upon the lands of defendant, and no complaint had ever been made of such flowage. But defendant claimed, and the request proceeds upon that theory, that the plaintiff, by means of back-furrows or other artificial means, diverted all of the waters theretofore flowing from the south through a natural water way, and none of which had previously come upon his lands, and cast them all upon his lands. If the waters from the south were by the wrongful act of the plaintiff mingled with the waters from the east, he is not in a position to complain because the defendant, in protect-

ing himself against the water unlawfully cast upon him, necessarily obstructed waters which otherwise it was his duty to receive. Manifestly the defendant could not distinguish between and separate the waters from the south and east, and dam only against the waters from the south, unless he went upon the lands of plaintiff at the risk of resistance and breach of the peace, which, in our opinion, no legal duty required of him.

In *Leidlein* v. *Meyer*, 95 Mich. 586, after calling attention to the fact that "there is no evidence that plaintiff turned upon the defendant's land any more than the natural flow of water," the court said:

"We need not refer to the decisions of other courts, where there is great conflict of authority as to the rights of the flowage of water from the upper estate over the lower. It is the settled law of this State that the natural flowage of water from the upper estate is a natural servitude which the owner of the lower estate must bear. *Boyd* v. *Conklin*, 54 Mich. 583. In that case Mr. Justice CAMPBELL ably and exhaustively discussed both the principle and the authorities, and arrived at the conclusion that 'the adjoining owners owe mutual duties—the one to receive the natural flow, and the other not to injuriously change its conditions.' The facts in that case are similar to those in the present case. We are in entire accord with the rule there laid down, which seems to us to be founded in good sense and reason. * * * There is nothing to indicate that the plaintiff has increased the natural flowage of water, or has in any manner changed its condition to the detriment of the defendant."

In *Horton* v. *Sullivan*, 97 Mich. 282, it is said:

"The circuit judge carefully guarded the defendant's rights in the admission of evidence and in his instructions to the jury. He very clearly instructed the jury that plaintiff had no right to construct and maintain open ditches and drains which would collect the water from his premises, ponds, sag holes, or pools, and cast it in unusual quantities upon defendant's land, and, if they should find he had done so, that he could not recover."

In *Finkbinder* v. *Ernst*, 126 Mich. 565, the court say:

" There was some testimony given that Hotrum, in plowing and cultivating his fields, left an embankment or furrow which caused the waters to be turned from and across plaintiff's lands, and turned them in the direction of defendant's. The court charged the jury upon that subject, as follows:

" ' If you find from the evidence that in process of time those water channels were changed; that, by reason of the natural and ordinary husbandry and tillage of the lands, the surface waters had changed their course, and that, where this dam is erected, the waters from the lands of the plaintiff naturally flowed over and spread upon the lower lands of the defendant; and that this flowage is not due to any other artificial means than ordinary husbandry and to natural causes—then the defendant would have no right to obstruct the flowage of those waters, even though the flowage had existed only for a few years.'

" We think this was error. The claim made by the defendant was that all these waters had from time immemorial flowed across the lands of the plaintiff; that none of them flowed across defendant's land until Hotrum had, by cultivation, made an embankment which prevented the waters from flowing across plaintiff's land, and precipitated them upon defendant's lands; and that, in view of that, he had a right to erect his dam to keep the waters from flooding his land. We know of no rule that would allow one to gather even surface water into one channel, and precipitate it even upon lower lands, to the damage of those lands."

In the case of *Highway Com'r of Tittabawassee Township* v. *Sperling*, 120 Mich. 493, the rights and duties of the parties were fixed by statute. In *Cranson* v. *Snyder*, 137 Mich. 340, complainant had three tile drains extending from his land into that of defendant. Up to 1895 two of these drains were constructed with three-inch tile. In 1895 complainant replaced the one with four-inch tile, and in 1896 he replaced the other with six-inch tile. In 1902 defendant closed up the mouths of all three of the drains, and the complainant filed his bill to restrain the maintenance of the obstruction. The circuit judge dismissed the bill as to the two drains relaid with larger tile, saying:

140 Mich.—40.

"It follows, therefore, that, as to drains Nos. 2 and 3, the claims of the complainant cannot be sustained; that in removing the old tile, of three inches in size, and substituting or placing thereon a four and a six inch tile, he exceeded his own rights; and, if the defendant embanked upon his own land against this increased flowage, he did that of which the complainant cannot complain until the rights of the parties are placed in statu quo."

The decree was affirmed in this court, and Mr. Justice GRANT, delivering the opinion of the court, said:

"Manifestly a four-inch and a six-inch tile will carry more water and carry it more rapidly than a round or horseshoe three-inch tile. It is conceded that the purpose of putting in the larger tile was to carry the water off more rapidly, and that it accomplishes the purpose. We think it is clear, from the cases above cited, that the owner of a dominant estate has not the right to collect the water upon his land by means of drains or ditches, and empty it in a body upon the servient estate. Complainant, therefore, in doing this, exceeded his right acquired by prescription, and his right to drainage in the usual course of good husbandry."

The rule as between adjoining owners, under our decisions, is one of mutual rights and duties. It protects alike the servient and the dominant tenements. The holder of the dominant estate cannot violate the rule in a substantial degree in so far as it protects the holder of the servient estate, and then invoke its aid in so far as it protects him.

But it is contended by counsel for plaintiff that such a defense was not open to the defendant, because not within the pleadings, and, if it was, no damages were shown from the excess of waters. We think the defense was competent under the general issue, without special notice. The plaintiff claimed that defendant obstructed either a natural water way, or a water way gained by prescription or adverse user. It was certainly competent to show, under the general issue, that the defendant did not obstruct such a water way, but only obstructed a water way caused by the unlawful act of the plaintiff. If it was necessary to prove that the excess of water was an injury to defend-

ant, such damage was abundantly shown by the testimony of the plaintiff himself, who testified as to a conversation with Behan about removing the dam which had diverted these waters to the west: "I told him he was doing a lot of damage to me, and more to Patrick Hogan, because it ran over through his lands more than on mine."

2. One Byron Brayton, a witness for defendant, who was highway commissioner, testified that in April, 1893, he heard the following conversation between O'Connor and Hogan:

"At the time O'Connor and Hogan were there, and Hogan would not help clean it out, O'Connor stated that, if the water was turned onto him, he would turn it onto Hogan. Hogan said, 'Don't you know the water always went west?' and O'Connor said it didn't make any difference if it always did—'If you turn it onto me, I will turn it onto you.'"

On cross-examination the following occurred:

"I think Mr. Hogan was pathmaster the time we were having this controversy about the ditch along the highway. I went there in the interest of Mr. Behan, because it was backing the water onto his land. There was no complaint that it hurt the highway. Hogan nor O'Connor were not there at the time I opened the dam along the highway. There was no water there at the time. It was dry. I think the complaint was made in the name of the supervisor against Mr. O'Connor. I didn't sue it out. I came down to see Mr. Hawley, prosecuting attorney, about it. I didn't attend the case. I was there at the time the case was settled. The supervisor was there attending at the time I was there. I was there at the trial, and was there at the time they settled it.

"*Q.* Now, witness, how much did they settle for?

"*A.* The township got a judgment against him for $25.

"*Q.* What did they settle for? Wasn't there an agreement drawn up there in your presence?

"*Mr. Hawley:* I object to this testimony as immaterial as bearing upon the question at issue in this case.

"*Mr. Ellis:* I want to show that there was a settlement under his own evidence, as bearing upon the question of whether Mr. O'Connor told Mr. Hogan in his presence there that, if he took that out, that it didn't make

any difference which way it run—he was going to make it run east and over him; that there was an agreement made there, and read over in his presence, that the water should run east over the natural course, and run over across Mr. Hogan. The question gives it bearing upon his credibility, and as to whether or not there was any such talk as he says.

"*The Court:* I think, upon the question of credibility, it may be received for that purpose. If Mr. Hogan did not take part in it, it could not be considered binding upon him.

"*Mr. Hawley:* An exception.

"*Q.* Wasn't this agreement read over in your presence, as follows ?

"'This judgment is this day satisfied by James O'Connor paying the costs of this suit and ten dollars damages to the Township of North Plains, he agreeing to keep a certain ditch on the south side of section fifteen open as it now is, allowing surface water to flow in the natural channel, nearly north, thence nearly east across Patrick Hogan's farm.

his<br>
[Signed]    "'JAMES X. O'CONNOR.<br>
mark.<br>
"'JAS. F. DALZELL.'

"*A.* No, sir.

"*Q.* You heard the settlement ?

"*A.* Yes, sir.

"*Q.* You knew how much was paid ?

"*A.* Yes, sir.

"*Q.* Didn't you hear the agreement that it was to be kept open, and that the water be allowed to run over Mr. Hogan's land ?

"*A.* That was all the suit was brought for—was to open this under the fence.

"*Q.* Wasn't Mr. Cusick a member of the board ?

"*A.* Yes, sir; and he owns the farm right west of it."

Mr. Cusick was also asked about this same matter, and Mr. Sessions, the supervisor; and after defendant rested, plaintiff and a member of the board testified that the receipt was read over in the presence of Brayton, and that he must have understood it. At the close of the case by plaintiff, the following occurred:

"To further maintain the issue, the plaintiff offered in evidence memorandum of agreement made between the township board and James O'Connor, stating that he offered it as bearing upon the credibility of Cusick's and Brayton's evidence, tending to show that Brayton claimed that he did not know where the water flowed at that time, and his story—what he claimed was said in his presence by O'Connor and Hogan as to what he would do about the water—was not true. Also offered in evidence the judgment simply to fix the date as to the transaction. The court said that the papers were not admissible as binding Patrick Hogan in any manner, but thought that the paper might be received as bearing upon the credibility of witness Brayton, to which ruling the attorney for the defendant excepted. Thereupon the paper was read in evidence."

It is manifest that the contents of this receipt could not but be extremely prejudicial to the defendant, as conveying to the jury the judgment of the township board that the natural water way was easterly over the lands of defendant. While this alone would not afford sufficient ground for rejecting the offer, it justified careful scrutiny and great caution. The town board had nothing to do with determining the natural channel in this case, as between Hogan and O'Connor. Hogan was not present, and his rights could not be affected by anything the board and O'Connor agreed upon. We do not think that the circumstances required a statement from Brayton of what he had heard O'Connor say someweeks before, and therefore that his silence was not an impeachment of the truth of his narration.

3. If error was committed by overruling the question to the witness Beebe, it was afterwards cured by permitting the same question to be put to several other witnesses; and, if defendant desired Beebe's testimony on this point, he should have recalled him.

4. Defendant's sixth request to charge was as follows:

"*Sixth.* The undisputed testimony in this cause shows that from the spring of 1889 to and until the spring of 1893 the Behan waters flowed west in a ditch constructed

by the plaintiff in the spring of 1889, along the highway, and from thence was cast upon Cusick's lands to the west; and I charge you that this period of time must be deducted from the fifteen years required to gain a prescriptive right, and constituted an interruption of the statute of limitations, and, unless you find that the requisite period of fifteen years had already run prior to the digging of this drain along the highway in 1889, then the plaintiff had never acquired any prescriptive right to have the Behan water flow upon defendant's lands."

The court did not err in refusing this request, for the reason that the testimony was not undisputed as to the facts stated in it. The request implies that all of the Behan waters flowed west through the ditch along the highway from the spring of 1889 to the spring of 1893. There was evidence that a portion of these waters, at least, during the period mentioned, flowed in what plaintiff claimed was the natural water way onto defendant's lands.

5. A motion for a new trial was made, stating several grounds. The only ground relied upon here is that Mr. Ellis, the attorney for plaintiff, went to the premises in question a short time in advance of the jury, in violation of a stipulation that the jury alone should visit and view the premises. After the view by the jury, Mr. Ellis was sworn as a witness, and the following occurred:

"He further testified on cross-examination that he was on the premises the day that the jury were there at the last trial, but did not go nor come with the jury, nor see them, nor converse with any of them while they were on the premises, and was not where they saw him; that he had no talk with the jury, one way nor the other, and, so far as he knew, none of them knew he was there or had been there; and thereupon the court said, 'Is it claimed that Mr. Ellis interfered in any manner with the jury, or that they saw him or had anything to do with him?' And the attorney for the defendant answered, 'No; nobody claims that he had anything to do with the jury, or influenced them in any way.'"

There is no merit in this point, and we pass it without further discussion.

For the errors above pointed out, the judgment is reversed, and a new trial granted.

MOORE, C. J., and CARPENTER, MCALVAY, and HOOKER, JJ., concurred.