CRANE *v.* VALLEY LAND CO.

1. WATERS AND WATERCOURSES—SURFACE WATERS—SERVITUDES—NATURAL DRAINAGE.

The natural flowage of surface water from an upper estate is a servitude which the owner of the lower estate must bear, and he cannot hold it back by dykes or dam its natural channels of drainage to the injury of the owner of the upper estate.

2. EVIDENCE—SIMILAR CONDITIONS—FOUNDATION.

In an action for damages for injury to plaintiff's standing timber and crops by obstructing his natural drainage, evidence of farmers as to their individual experience with their own land to support the defense that the crop failure was due to unfavorable seasons, without laying the proper foundation of similarity, was inadmissible.

3. NEW TRIAL—DISCRETION—ABUSE.

Refusal of plaintiff's unopposed motion for a new trial because of the court's action in striking out, of its own motion, in the midst of the charge, of legal documents introduced by plaintiff to refute defendant's contention that plaintiff had agreed to the construction of the dyke where located amounted to an abuse of discretion.

4. SAME—PLEADING—DILIGENCE—NEWLY-DISCOVERED EVIDENCE.

Where defendant's plea was the general issue with notice of the defense that plaintiff had consented to the dyke complained of as placed, plaintiff's failure to anticipate and prepare for the defense of high water on Lake Huron during the years involved was not an inexcusable lack of diligence, and a new trial should have been granted to enable him to present government data and newly-ascertained evidence material to a vital issue in the case.

5. TRIAL—REQUESTS TO CHARGE—INSTRUCTIONS.

In an action for damages caused by the construction of a dyke, where defendant emphasized the fact that plaintiff was refused a temporary injunction, plaintiff was entitled to have the jury instructed, as requested, that the granting or not granting of a temporary injunction is no ground for action or defense.

Error to Saginaw; Miner, J., presiding. Submitted April 17, 1918. (Docket No. 107.) Decided October 7, 1918.

Case by Riley L. Crane against the Valley Land Company for damage to land by flooding. Judgment for defendant. Plaintiff brings error. Reversed.

*Riley L. Crane* (*Otto & Davis,* of counsel), *in pro. per.*

*Arthur Otto* (*E. L. Beach,* of counsel), for appellee.

STEERE, J. Plaintiff brought this action in the circuit court of Saginaw county to recover damages for injury to crops and standing timber during the years 1914-1916, from excessive water upon his 80-acre farm located in Kochville township, Saginaw county, caused

as he charges by certain dykes built by defendant obstructing his natural drainage. From an adverse verdict and judgment he has removed the case to this court for review claiming prejudicial error on various. assignments.

Defendant is a Michigan corporation, with headquarters at Bay City, organized for the purpose of buying and reclaiming by dyking and draining certain marsh and overflowed land in the Saginaw valley lying immediately to the east and north of plaintiff's farm, between it and the Saginaw river.

Plaintiff's 80 acres is described as the E ½ of the S W ¼ of sec. 19, town 13 N, of range 5 E. It is located just east of the Michigan Central Railroad line between Saginaw and Bay City, in the lower portion of the Saginaw valley where the land is generally flat and near the water level, much of it to the east and north of the plaintiff's farm being, in its natural condition open marsh too low and wet for successful agriculture and, because of the water level, difficult to drain and reclaim. His farm is, however, as described by him without dispute, exceptionally high for that locality and sufficiently dry in its natural condition for cultivation, having formerly been "all wooded except about five acres at the south," with good natural drainage into a tributary of the Saginaw river called Davis creek. It is clay land with a black loam top soil and one of the pioneer farms of Saginaw valley, early settled upon, cleared and successfully cultivated for many years. With the exception of the 16-acre woodlot it had been a cleared and, improved farm under cultivation since plaintiff first became acquainted with it in 1880. Attracted to it as a fertile and productive farm he purchased it in 1897, and thereafter successfully cultivated and cropped it, with a tenant in direct possession who continued for 20 years to work it on shares under plaintiff's direction, raising

annually and profitably good yields of the customary
crops grown by farmers—such as wheat, corn, oats,
beans, buckwheat, potatoes, sugar beets and the usual
garden products, without failure until in 1914 when
defendant in a project to reclaim the marsh land be-
low him constructed and closed its dykes which, as
he contends, so obstructed his former free drainage,
soaked with seepage and flooded his land that there-
after trees in his woodlot died, his meadows and pas-
tures deteriorated, and the cultivated fields, cropped
and tilled in the same manner as formerly so far as
possible, failed to produce in whole or part, as a result
of which the crops and income from this farm were
not to exceed one-half of normal in 1914 and one-
fourth in 1915 and 1916.

Davis creek is a small tributary of the Saginaw
river, navigable in the sense that it is boatable and
a drivable stream for logs. Its general course is east
and northerly, furnishing drainage for much of Koch-
ville township lying to the west of plaintiff's farm,
which the creek crosses near the south line flowing
practically east to some twenty rods beyond his east
line when it swings nearly north across section 19,
furnishing his land drainage to the south and east,
then runs more northeasterly through yet lower marsh
lands for about one and one-half miles to where it
joins the Saginaw river, which flows a northerly
course varying easterly to its outlet in Saginaw Bay.
Between plaintiff's farm and the Saginaw river, the
land to the east and north was in its natural condi-
tion, open prairie and marsh, lower than his except
an elevation called Calf island, subject to floods in
high water, and portions so low as to be submerged
by the normal water level. A tract of this marsh
said to be about two miles in extent east and west and
about four miles north and south lay in what is termed
a basin partly submerged much of the year, and so

near on a level with Saginaw bay that the water upon it varied with the condition of wind and water level on the bay. Referring to this low territory east of plaintiff's farm defendant's engineer said:

"The north wind drives the water from Saginaw river into Davis creek. The water goes as high as the Saginaw river is. If the water raises a foot on the land it might raise and spread over half a mile. If it raises three feet it might go back a mile and a half to the west."

The soil of these low lands of the Saginaw valley are said to be largely lake clay, or the clayey portion of an ancient lake bed, known to be fertile and of high productivity when well drained. The purpose of defendant's organization was to purchase and reclaim these practically worthless marshes by a system of dredge cuts and enclosing dykes above high water mark, with a pumping station to drain the enclosed territory.

Actual work was begun upon this project in 1912, and while yet in its preliminary stages plaintiff, in anticipation of the result to his property, made inquiry, suggestions and protest against the work as planned. No adjustment being reached he filed a bill for an injunction to restrain defendant from interfering with his drainage by building any dyke within one-half mile east of his land, or along the east side of section 19 so as to inclose Davis creek. An order was made by the judge to whom he applied, on March 4, 1913, requiring defendant to furnish plaintiff a bond to protect him against any damage to his land by water resulting from its dykes being too near the same. The work proceeded, however, without any bond being given until defendant reached with its cut and dyke the south side of section 19 and proceeded towards the west and in July, 1913, plaintiff appealed to the court for preliminary relief under his bill and the

judge to whom he applied, together with the parties in interest and counsel, went upon the ground where they looked over and discussed the situation. The evidence is in conflict as to whether or not any agreement was reached between the parties whereby plaintiff consented to what was subsequently done, but it appears that defendant gave assurances to the judge as to where its dyke east of plaintiff's land would be located. He then orally directed that it file the bond previously ordered and permitted defendant to proceed in the direction the dredge was then working, and the bond was thereafter filed. Some three weeks later defendant turned north on section 19 so far to the west that it crossed the windings of the creek with its cut and dyke. Plaintiff claimed this was in violation of its promise to him and the judge who permitted it to proceed, which defendant denied claiming that the cut, which was west of the dyke, served to straighten out the creek, or supply the drainage previously furnished by it. To what extent it served that purpose is in marked dispute. While this work was going on an application was made by the township of Kochville for an injunction to restrain defendant from putting any dyke in or west of the creek, which was granted. The cut and dyke were continued north through section 19 and defendant thereafter completed a dyke east from the north quarter post of that section closing its dykes.

Plaintiff's claim is that the natural drainage through Davis creek was destroyed, and the cut on the west outside of the north and south dyke constantly remained full of water because of insufficient fall and outlet; that this dyke extending north and south in the line of drainage so near his land on the east, between it and the river, is in itself a complete barrier to the natural escape of water from his premises to where it had previously gone, and with the other dykes

excludes it from a large area of much lower inclosed marsh land where it previously flowed and spread, thus impeding and changing the former free drainage conditions so that his land remains constantly soaked and too wet for successful tillage.

Defendant's contention is that the cut outside of the dyke furnishes better drainage below plaintiff's land than Davis creek did in combination with all the low area north and east of the Saginaw river; and that plaintiff consented to its placing this dyke where now located north and south through section 19, which he emphatically denies. These issues upon which there is much conflicting testimony were within the realm of facts for the jury.

The law is well settled in this State and elsewhere that the natural flowage of surface water from an upper estate is a servitude which the owner of the lower estate must bear, and he cannot hold it back by dykes or dam its natural channels of drainage to the injury of the owner of the upper estate. *Boyd* v. *Conklin,* 54 Mich. 583 (52 Am. Rep. 831) ; *Leidlein* v. *Meyer,* 95 Mich. 586.

Defendant does not question this rule of law nor on the facts seriously controvert plaintiff's evidence as to the history, previous condition and productivity of his farm, but contends as to his failures of crops in the years for which he seeks damages that they were not as serious as he claims, but were to the extent actually shown the result of weather conditions during those years, in which the seasons were unfavorable for farming owing to excessively wet springs and later drouths, common to all and causing poor crops generally in that region. To sustain that contention certain testimony of farmers was introduced by defendant as to conditions elsewhere and failure of their own crops, without showing that the conditions, crops, tillage, soil, elevation with natural drainage facilities,

etc., were like or similar to those of plaintiff's farm, admission of which is assigned as error. While it was competent to show the weather conditions during those years and how crops were generally affected by them in that section—whether they were favorable or unfavorable years for crops and why, it was incompetent to show against objection the special experience of the individual farmer with his own land and crops without laying the proper foundation of similarity. Without detailing the particular instances it may be said in passing that this was permitted during the trial to an objectionable if not prejudicial extent.

A serious issue in the case strenuously contested was whether plaintiff waived his objections to the north and south dyke east of his land being constructed where it is located on section 19. Defendant claimed he did so when the parties were on the ground with the judge to whom plaintiff had applied for an injunction and who had previously ordered an indemnity bond which he again orally directed defendant to give. He was there but once. Plaintiff contended that in the affair there was no agreement, but on the contrary he was earnestly requesting of the court protection and relief which he failed to obtain except to the extent of the bond which was given three weeks later and, it being for a limited time, an auxiliary agreement by defendant to give a further bond for the same amount as permanent indemnity, or protection against damages to his drainage. In support of his claim that there was no consent by him to the line as located, plaintiff produced these papers from the files of the chancery suit between the parties, identified and offered them in evidence. On objection by defendant's counsel they were not then admitted but after discussion held by the court for consideration, and near the close of the case were re-

ceived in evidence.   In the midst of the charge, after
explaining and submitting to the jury the question
of whether plaintiff agreed to the location of the dyke
where placed and instructing them that in such case
"plaintiff cannot recover any damages which he has
been caused by defendant doing what plaintiff greed
then to do," the court said to plaintiff:

"I· think now,  *  *  *  I will have to take those
papers from consideration of the jury for this reason:
That they were not read in evidence,  *  *  *  I
think I will take them from consideration, the bond
and agreement."

And went on with the charge, first saying to the
jury:

"But you have a right to take into consideration
all the facts in the case that I have not withdrawn
from you in determining whether such an agreement
was made or not."

To this transaction in the midst of the charge plain-
tiff seasonably excepted, later presenting it as one
of his grounds for a motion for a new trial, which
was refused, and he now urges it as prejudicial error.
That it was prejudicial to plaintiff's contention as to
the significance of these papers upon a controlling
issue of fact in the case, if decided against him, is
evident.   They were legal documents from the files
of a case between the same parties and in the hands
of the court, were held for some time to consider their
admissibility, and after discussion admitted, as the
court stated in the presence of the jury, for their
bearing upon the probability of plaintiff having con-
sented to the dyke of which he complained being put
where it was located, "but for no other purpose," the
court then saying directly to the jury, "Now, gentle-
men of the jury, when I say for no other purpose, do
not use them for any other purpose."   When they
were withdrawn by the court during the charge while

discussing the only matter to which they related, with instructions to the jury not to take them into consideration, no objection had been made by defendant to the jury considering them, after they had been admitted, the general nature of, and plaintiff's purpose in offering these legal documents had been stated and discussed in the presence of the jury. Their only purpose was to indemnify plaintiff and the fact that they were given was but circumstantial evidence bearing upon the probability of another claimed fact directly involved in the case. It would seem that the jury were sufficiently advised by what had transpired in their presence and was said to them of the nature and purpose of these documents to understandingly pass upon the significance of their having been given, and if at that stage of the case the court thought for any reason they should be further advised or instructed the documents were in evidence in the hands of the court and available for that purpose. If it was technically discretionary with the court on its own motion to at that time strike them out, in the midst of the charge, for the reason stated, we are impressed that under the circumstances shown and verdict rendered such course tended prejudicially against plaintiff's contention on an issue of fact in which an adverse verdict was fatal to his case, and the court's refusal to grant plaintiff's subsequent motion for a new trial, which he states in his brief was not opposed, amounts to an abuse of discretion. Plaintiff twice presented his motion for a new trial, the second time supported by affidavits, with Government data and maps, made a part of the same, tending amongst other things to show that the level of Lake Huron including Saginaw bay was not above normal during the years in question as had been claimed with supporting testimony by defendant to account for any excessive water around its dykes. This the court rejected as cumula-

tive when denying the motion. Defendant's plea was the general issue, with special notice of the defense that plaintiff had consented to the dykes as placed. While perhaps within the scope of the general issue, the distinct defense of high water on· Lake Huron during those years was not suggested by the pleadings and it can well be urged that plaintiff's failure to anticipate and prepare for it was not an inexcusable lack of diligence. What he presented was apparently new and newly-ascertained evidence, material to a vital issue in the case. We are impressed that considered as a whole plaintiff's motions present meritorious features in law and fact entitling him to a retrial.

In relation to plaintiff's application for a temporary injunction in the chancery suit between the parties which was shown in connection with the judge and parties viewing the premises, defendant emphasized the fact that a well-known judge to whom plaintiff applied did not grant the same, but permitted defendant to proceed with the work. Referring to this application plaintiff requested the court in writing to instruct the jury that "The granting, or not granting, a temporary injunction is no ground for action, or defense, in this action." The manner in which the occasion of his unsuccessful application for an injunction was testified to and discussed during the trial made this request pertinent and of added importance to plaintiff. He was entitled to have the jury instructed as requested. Failure to do so was error.

As the case will be sent down for retrial it is inadvisable and unnecessary to review the exhaustive discussion and argument of evidence to which counsels' briefs are largely devoted and which relate largely to the facts in issue, or to pass upon the many other assignments of error, some of which do not call for serious consideration, while any that might otherwise

demand discussion are not likely to arise upon retrial of the case.

For the reasons stated the judgment is reversed with costs to plaintiff and a new trial granted.

OSTRANDER, C. J., and BIRD, MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.