141   233
153   ¹272

TOWNSHIP OF MERRITT v. HARP.

1. DRAINS—REPAIR—ENLARGEMENT—SURFACE WATER.
   A county drain commissioner is entitled to clean out old waterways and drains to the depth to which they were originally excavated, but he is not authorized to enlarge them, and thereby cast larger quantities of water collected from the drainage of an additional area during shorter periods on the highways, bridges, and culverts of an adjoining township in another county to its damage. [1]

2. SAME—ARTIFICIAL WATERWAYS.
   Certain waterways used for the drainage of land are none the less artificial because the drain commissioners in constructing the same make use in large part of depressions and washed-out channels where the storm and surface water flowed in a state of nature; the natural waterways being insufficient to afford the desired drainage.

3. VENUE—ENJOINING ENLARGEMENT OF WATERWAY.
   A suit by a township to prevent the enlargement of artificial waterways constructed by officers of adjoining counties is properly brought in the county where complainant township was located.

4. DRAINS — ENLARGEMENT — COUNTY DRAIN COMMISSIONER — PERSONAL LIABILITY.
   Where a county drain commissioner unlawfully increases the size of an artificial drain to the injury of lands in an adjoining county he is personally liable for the damage.

5. TOWNSHIPS—INJURIES TO HIGHWAYS—RIGHT TO RECOVER.
   A township is not entitled to recover damages for injuries to its highways, bridges, and culverts, caused by the enlargement of artificial watercourses by the authorities of adjoining townships and counties.

ON MOTION TO MODIFY DECREE AS TO COSTS.

COSTS—APPEAL—PRINTING.
   Where a part only of the appellants in a chancery case are

---

[1] For rights as to flow of surface waters generally, see note to *Gray* v. *McWilliams* (Cal.), 21 L. R. A. 593.
   For rights and duties of municipal corporations with respect to surface water, see note to *Johnson* v. *White* (R. I.), 65 L. R. A. 250.

successful on appeal, they will be allowed to tax as costs
the expense of printing only such parts of the record and
brief as were necessary to present their case.

Appeal from Bay; Connine, J., presiding.   Submitted
May 5, 1905.   (Docket No. 145.)   Decided September 19,
1905.   Motion to retax costs submitted May 1, 1906.
(Calendar No. 20,624.)   Granted July 24, 1906.

Bill by the township of Merritt against William Harp,
drain commissioner of Tuscola county, and Francis Daw-
son and William Findlay, highway commissioners of Gil-
ford and Denmark townships, respectively, in said county,
to restrain the flooding of complainant's highways.   From
a decree for complainant, defendants appeal.   Affirmed
in part.

*Isaac A. Gilbert* (*James Van Kleeck*, of counsel),
for complainant.

*G. W. Davis* (*T. W. Atwood*, of counsel), for defend-
ants.

BLAIR, J.   The defendants have appealed from the de-
cree entered in this cause, which requires them to fill up
certain drains in the townships of Denmark and Gilford,
which were constructed and have been maintained by and
under the authority of the township drain commissioners
of said townships and the county drain commissioner of
Tuscola county.

The complainant township is the southeast corner town-
ship of Bay county.   Adjoining it on the east is the town-
ship of Gilford in Tuscola county.   Adjoining the com-
plainant township on the south is the township of Blum-
field in Saginaw county, and adjoining Blumfield on the
east and adjoining Gilford township on the south is the
township of Denmark in Tuscola county.

The complainant township alleges that sections 14, 23,
24, 25, 26, 35, and 36 of the complainant township are
low ground, and that there is no outlet for the water flow-

ing thereon; that there is a highway extending across the township from east to west, half a mile north of the south line of the township, and another one mile north of the south line of the township, and still another three miles north of the south line, and that there is also a highway extending from the south line of complainant township, one mile west of the east line thereof, northerly about four miles; that on said highways there are culverts and bridges, which have been constructed by the township and are under its care; that commencing in the interior of the township of Gilford, and extending across several sections and across the south line of the township of Gilford into section 6 of the township of Denmark, and from thence into section 1 of Blumfield township, Saginaw county, is a waterway known as "Squaw Creek," which conducts water down onto section 36 of the. complainant township; that there are other waterways, which it names, and ditches, which carry water down to the same point from the townships of Denmark and Gilford.

One of the ditches which it undertakes to describe in its bill of complaint is known as "Reese Creek," or "Reese Drain." The complainant alleges that the county authorities of the county of Tuscola, to wit, the county drain commissioner of Tuscola county, the township authorities of the townships of Gilford and Denmark, and the highway commissioners of said townships, have caused certain drains and ditches to be constructed and maintained in said townships of Gilford and Denmark; that said county authorities of Tuscola county, or said township authorities all or some of them, have caused to be constructed and maintained a ditch or drain known as "Squaw Creek Drain," and that it conveys the water from the townships of Denmark and Gilford into section 1 of Blumfield, and that from thence it flows over the surface of the ground in complainant township; that the county authorities of Tuscola county, or said township authorities of Gilford and Denmark, or all or part of them, have caused to be constructed the Reese drain, and complainant undertakes

to describe the location thereof, and alleges that the same traverses several sections of the township of Denmark, and crosses the county line into section 12 of Blumfield, and then flows over the surface of the ground into said low lands in complainant township; that by reason of the construction and maintenance of the ditches and drains in Tuscola county large quantities of water are collected and discharged upon said low lands in complainant township, and with such force as to injure and destroy the highways, bridges, and culverts; and that the water remains upon the low lands, and stagnates, and endangers the public health.

After the taking of the testimony in said cause the complainant amended its bill of complaint, so as to include in its allegations several other public drains in said townships, namely: The Ayers drain, the Weiss drain, and the Van Patten drain, and also the Ryan drain, the waters from which flow through the Squaw Creek, the Pesick, and the Schemm drains, which intersect the Reese drain. The defendants interposed a demurrer to this bill of complaint, which was overruled by the circuit judge, whose ruling was sustained by this court. *Township of Merritt* v. *Harp*, 131 Mich. 174. The defendants thereupon filed their joint and several answers, denying:

(*a*) That the highways of the township of Merritt mentioned in the bill of complaint are under the control of the township.

(*b*) They deny that there are any bridges in Merritt township at the places mentioned in the bill of complaint, but culverts only, and allege that they are under the control of the highway officers of said complainant township.

(*c*) Defendants deny the alleged value of the bridges or culverts.

(*d*) The defendants deny that there is no outlet or escape for the water which flows onto the low lands of Merritt, and deny that the water becomes stagnant and offensive, and that a nuisance is created thereby.

(*e*) The defendants deny that they have constructed any highway ditches in either of said townships for the last past 20 years, which have had any tendency to increase

the volume of water which flows into either Squaw Creek or Reese Creek drain.

(*f*) The defendant highway commissioners deny that the highway commissioners of either of said townships have ever had anything to do with the construction or maintenance of any of the public drains in said township, particularly of Squaw Creek drain or Reese drain.

(*g*) The defendants deny that there is any increase in the volume of water discharged upon the highways of the complainant township by reason of the construction and maintenance of ditches and drains in Tuscola county.

(*h*) The defendants deny constructing or maintaining artificial drains or ditches having an outlet in Squaw Creek or Reese Creek drains which increase the flow of water therein, or that cause any greater quantity of water to flow upon the lands of complainant township.

(*i*) The defendants allege that Squaw creek and Reese creek are natural streams or watercourses, and not artificial, and that the waters from said creeks are discharged into another creek, in the township of Blumfield in Saginaw county, which runs into and traverses the township of Merritt, and discharges the waters thereof into the Quanicassee river, and that all of the creeks are streams with bed and banks and with flats, with well-defined banks bordering the flats in nearly all places, excepting for a short distance in the township of Merritt.

(*j*) The acts complained of are all alleged to be official acts performed in the county of Tuscola by them, if at all, in pursuance of their duties as such officials; and the defendants, at the time of the filing of the bill of complaint, were all residents of Tuscola county, and in and by the bill of complaint no act is alleged to have been performed or attempted by the defendants, or either of them, in the county of Bay. And the same is set forth by the defendants in a plea to the jurisdiction of the court accompanying the defendants' answer.

There are no streams of living water in the townships of Denmark or Gilford, and the so-called creeks, Blumfield, Squaw, and Reese, are not creeks in a technical sense, but are runs or waterways, where surface water naturally flowed from the lands within the watersheds drained by them. The waters of the watersheds drained by Squaw creek and Reese creek were discharged from time im-

memorial through those waterways into the Blumfield creek, which they reached on section 1 of the township of Blumfield.    After mingling with the waters of Blumfield creek, the waters were carried over into the township of Merritt.

Complainant contends that Blumfield creek discharges its waters into a swamp, known as the "duck pond," lo-. cated partly in the township of Blumfield and partly in the township of Merritt, to which there is no natural outlet.    Defendants claim that this duck pond, so called, is merely an extension of the Blumfield creek, though without definite banks, and has an outlet towards the northwest, finally reaching in a state of nature the Quanicassee river.    The lands in the four townships of Blumfield, Merritt, Denmark, and Gilford are quite low, and in an early day they were largely covered with water.    They have been reclaimed by drainage, so that large tracts are now good farming lands.    This is particularly true of the townships of Gilford and Denmark, in which most of the low, wet lands have been turned into productive farms. The drains which come in question in this suit are as follows:

*The Squaw Creek drain*, which was constructed in 1885 in sections 31, 32, 33, and 28 of Gilford, of a total length of 238.56 chains.

*The Reese Creek drain*, which was constructed in 1884 in sections 7 and 18 of Denmark, of a total length of 131.23½ chains.

*The Van Patten drain*, which was constructed in 1870 in sections 3 and 4 of Denmark, of a total length of about 1¼ miles.

*The Ayers drain*, which was constructed in 1885 in sections 4, 8, and 9 of Denmark, of a total length of 217.74 chains.

*The Weiss drain*, which was constructed in 1889 in section 17 of Denmark, of a total length of 441½ rods.

*The Pesick drain*, constructed in 1899, along the east and west section line between sections 8 and 17 of Denmark, till it turns northerly into section 7, of a total length of 5,284 feet and 10 inches.

*The Ryan drain,* constructed in 1891 on section 6 of Denmark, of a total length of 312 rods.

*The Schemm drain,* constructed in .1901 on sections 7 and 8 of Denmark, of a total length of 94.90 chains.

*The Squaw Creek improvement drain,* located in 1897 along the town line between Gilford and Denmark, and then running southwesterly across section 6 of Denmark, about four miles in length. The completion of this drain was stopped by injunction.

The Weiss drain and the Ayers drain were dug in and followed generally the course of a natural runway for surface water, known as the "South Branch of Squaw Creek," which discharged its waters into the Squaw creek on section 28 of Gilford. The Van Patten drain emptied its waters into the Ayers drain. Squaw Creek drain was constructed partly in and partly outside of the Squaw Creek waterway, but at its lower end was in the creek. The Ryan drain also emptied its waters into Squaw creek. The Pesick drain and the Schemm drain connected with the Reese Creek drain. The Pesick .drain was laid out and constructed in old highway ditches, and the Schemm drain followed drainage ditches. The Schemm drain has. not been fully constructed. Orders were made for the cleaning out of these drains by the drain commissioners as follows: Ayers drain, August 27, 1901; Reese drain, August 28, 1899; Ryan drain, May 29, 1900; Squaw Creek drain, July 24, 1900; Weiss drain, July 15, 1895. The Van Patten drain was cleaned out in 1896, and an application for the cleaning out of the Weiss drain was filed with the commissioner July 12, 1902. A tabulation of the expense of cleaning out these drains and the cost of new drains was given by defendant Harp, as follows:

|  | Cost. | Paid. | Bal. on hand. |
|---|---|---|---|
| Squaw Creek, cleaning | $779 65 | $774 27 | $5 42 |
| Squaw Creek, improvement | 2,108 00 | 833 52 | 1,274 48 |
| Ayers Drain, cleaning | 821 00 | 468 95 | 352 05 |
| Reese Drain, cleaning | 295 90 | Overdrawn | 21 95 |
| Pesick Drain, cost | 1,020 00 | 995 79 | 24 21 |
| Schemm Drain, cost | 507 00 | 228 60 | · 278 40 |
| Weiss Drain, cleaning | 309 00 | 70 90 | 238 10 |
| Ryan Drain, cleaning | 109 45 | 109 45 | ------ |

Complainant claims that the cleaning out of the old drains, and the construction of new drains since 1895 has caused a greater volume of water to be discharged against their roadways, culverts, and bridges, and with greater force than prior thereto. The supervisor and other officers and residents of the township of Merritt testified that the overflow of waters coming through and from the duck pond had been getting worse for the last four or five years, and particularly for the last three years; that the effect of such overflow was to wash out their roadbeds, culverts, and bridges; and that the overflow was, in the main, attributable to the waters coming from the townships of Denmark and Gilford. The defendants insist that the cleaning out of the old and the construction of the new drains has not carried more water nor with greater force than prior thereto, and that, even if such were the result, it was lawful, since Squaw creek and Reese creek were natural watercourses, and—

"The establishment of the same into public drains by the drain commissioners did not in any wise destroy or change the character of the same. They are still to be considered as natural watercourses. * * *

"All of the cases in Michigan that militate against the right of drainage in any way are where the party sought to drain water through an artificial channel but there are no cases which hold that one cannot dig ditches for draining the land if the water flows into a natural channel."

We think the evidence clearly establishes the complainant's claim that its bridges and roadbeds were washed out by waters coming in greater volume and with greater force since 1895, and it only remains to consider upon this branch of the case, whether the drains in question caused this injury, and, if so, were such drains natural or artificial watercourses? Squaw creek originally connected two swamps or swales. Defendants' witness Mitchel says of it:

" I remember seeing that ever since 1864. The water ran from one swamp to the other. You might call it a

natural watercourse.  *  *  *  One of those swamps is in the township of Gilford; the other, in the township of Merritt and Denmark, too.  That watercourse between those two swamps was Squaw creek.  The ground was lower to the west, and drained the water out of this swamp in Denmark and Gilford into Merritt through this channel called 'Squaw Creek.'  I refer to that before any digging or ditching was done in Squaw creek.  This watercourse between the two swamps, I could not say exactly how wide it was.  In some places 30 or 40 rods, and some places wider.  There has been some ditching from one swamp to the other.  The ditching collects the water where it used to spread out, and it is now running in the ditch between the two swamps, and that ditch takes the water from the swamp in Gilford and Denmark into Merritt."

Defendants' witness Van Buren testified:

"The ditch follows the old watercourse across section 6 of Denmark, and to section 32 of Gilford to within a hundred rods of the east line.  It does not follow the line which I know as the old creek from that point to the section line running east and west between sections 33 and 28, but from where it turns to run north into section 28 to the end of the ditch it follows the line, as near as I can tell.  The end of the ditch, I think, is on the quarter line running east and west in section 28.  Yes, as near as I can understand, where the ditch is running north and south through section 28, follows the old watercourse; but along the south side of 28 and the east side of 33 it does not follow the old watercourse; at least, for only a little ways.

" Q. How many right angles are there to that ditch ?

"A. Three.  I don't think there ever was any to the old watercourse.  *  *  *

" Q. Following down southwest where the ditch is dug in what you denominate the 'old watercourse' tell us where that ends or what is its outlet.

"A. So far as I know, the outlet is Saginaw county.  It runs clear to the county line; it runs across section 6 of Denmark."

Defendants' witness Weber testified:

" Q. Now, referring to the Squaw creek over in the
141 MICH.—16.

township of Denmark, how wide is it between the banks to the flats in section 6 of Denmark?

"*A.* It varies from 6 rods to 40 rods.

"*Q.* Was there ever any cleaning out of that creek through section 6 of Denmark?

"*A.* Yes, two or three years ago; and it was cleaned out before that. The first 20 or 30 rods east from the county line was cleaned out by Charles Lindow, and then here and there along it for 40 rods they have worked at it little by little for the last 12 years. They just cleaned out the logs and brush, and they also took a horse and scraper, and scraped out a little, 4 or 5 feet wide, in places."

Defendants' witness Lindsey, who constructed the Squaw Creek drain, testified:

"*Q.* Will you swear that when you constructed the Squaw Creek drain you did not make the ditch in the swamp and along the road and in that part which you call Squaw creek deeper than nature had left it at that time?

"*A.* No. It was cut deeper. It was the purpose to make it deep enough so as to draw the water off the surface of the land and for the purpose of increasing the flow where that slow water was.

"*Q.* Isn't it a fact that the ditch through the south part of section 28 traverses land that used to be a swamp, and is, in fact, low, swampy land today?

"*A.* It is low land, but they are cultivating it. They made that ditch so that they could cultivate it."

Defendants' witness Honsinger testified:

"Yes; I have been along the course of Squaw creek through section 6 of Denmark. That creek was first cleaned out in Denmark, if my memory serves me right, about four years ago. The creek through there, through section 6, before it was cleaned out, was somewhat higher than it is through section 31 of Gilford."

Defendant Dawson testified that "in the center of 32 there used to be, you could not call it dead water, but it was pretty nearly level land; the water stayed there longer." Charles Schroeder testified that he lived on section 4 of Denmark, and the Ayers ditch joined the Squaw

Creek drain south of his house; that the cleaning out of the Ayers ditch brings more water into Squaw creek; that the Squaw creek was cleaned out larger and deeper than it was before. Theudas Randall testified that the Schemm drain was cleaned out down next east of the railroad. Counsel for defendants stated that Squaw creek was cleaned out across the northwest corner of section 6 of Denmark as part of the work done on the Squaw Creek improvement drain. Mr. Buetow, supervisor of Denmark, testified:

"Squaw creek goes up to the line between Denmark and Gilford at section 6, and no further. At the county line I said the flats were 5 or 6 rods wide, and not quite so wide at the other end."

That the water has not increased in volume in Reese Creek drain, but "the current may be a little faster in time of high water." The water in the highway ditches "would naturally go off a little faster, but I do not believe it would come much swifter after the ditches were once full." He also testified that the Pesick drain was somewhat deepened and widened. Joseph Brennan, who lived on the southeast quarter of section 36 of Merritt township, adjoining the duck pond, testified:

"The last three years I have noticed that the water spreads out to the east on my place; that is, it extends farther east than it did the years before; I should think about 16 rods."

That the action of the water between the county line and Blumfield creek has increased the channel each year. Mr. Johnson, a surveyor and civil engineer of long experience, speaking of Squaw creek, says.

"What is called 'Squaw Creek' is a swale surrounded by the higher land and small marshes and willows that go to make up a watershed; but, as far as calling it a creek, it has no semblance of a creek, only what is artificial."

Francis Preston testified:

That the cleaning out of Squaw creek "allowed the

water to come down more fiercely at once, flowed quicker. * * * I cannot tell exactly the amount of increased water this cleaning and ditching has amounted to, but the cleaning and ditching and emptying more drains into the Reese drain and Squaw creek has caused the water to come down with more current, and fiercer, after heavy rains, and before it has time to get off the low lands the crops are destroyed thereby and damaged, and different roads and highway culverts, and also, to the best of my judgment, several farming sections, are damaged thereby." That his testimony was based "on my observation of the water and also of the drain that had been cleaned out and dug. * * *

"Q. But you would not claim that it would add to the territory drained, simply by cleaning out the old drain, would you?

"A. Yes, I would; for the reason, by cleaning it out and deepening it, it would give other drains that empty into it a better chance to discharge their waters."

Mr. Howell, the supervisor of Merritt, testified that the flow of water had increased at least one-third in the last three years. Mr. Oeder, who resided on section 1 of Blumfield, testified that more water came onto Blumfield after the cleaning out of Squaw Creek drain; that they cleaned out Squaw creek east of the county line about 80 rods. Mr. Horton testified:

"Whenever there would be a heavy fall of rain east of us, in about two days thereafter, our lands would be washed by the water coming from the duck pond; this happened sometimes when there was no rainfall on our lands."

Mr. Tennant testified that there had been more water for the last five years, and it was increasing every year. Joseph Richards, Jr., testified that Squaw Creek drain was widened and deepened in 1899. Mr. Van Buren testified that in an early day Merritt township was very wet, a dead swamp, the majority of it; but as compared with that period the same country is fair farming land. Supervisor Howell testified:

"But there is such a fall of water from Tuscola county upon the township of Merritt that the township of Mer-

ritt and the residents are not able to dig ditches sufficient to take it out of those pond holes."

Defendants' witness Teske made the survey for the Squaw Creek drain in 1885, and for the cleaning out thereof in 1899.   He testified that from the center of section 32 the drain did not follow the natural course of the water.   "It followed up onto dry land, straight east along the quarter line."   The drain then ran north along the section line between 32 and 33, thence east along the section line between 32 and 28, then north across the southwest quarter of section 28, where it traversed section 28.

"The water had no regular channel, but in those flat lands the water seemed to move over the land.   In some places it was deeper than others, not usually so, but as natural to that class of land.   *   *   *
"Q. Can you state whether, in your resurvey for the cleaning out of the drain two or three years ago, you made any change in the course of the drain?
"A. No, sir; we did not.   When we cleaned the drain, we took the old drain as it was dug, and we did not take any minutes of the course, but simply staked it out, and every 8 rods took a level in the bottom of the drain, and we made no change in the width or depth from what it was originally laid.   I endeavored to get it as near as possible the same as the original depth, but at the outlet I think it is a little higher.   *   *   *   I do not know how much of the work was done on the Squaw Creek drain in 1885.   I had nothing to do with the accepting of the drain, and I had nothing to do with the drain from that time until I took the levels in 1899.   I then discovered that it was not down to the original grade.   As I found it then, I found that it was filled from some cause, or else it had not been dug out in the first place, nearly the entire length of the drain.   I found that there was from half a foot to 3 feet in some places, and from half a foot to 3.9 feet in one place.   The entire length of all the places where the excavation had to be made over 2 feet, giving it the extreme, I should say was about 88 rods.   The deepest cutting was from near the center of section 32 and between that and the east quarter post.   It was through the ridge before you reach the quarter post.   I left the original width.   I simply gave the width of bottom and depth of

cut in my figures. I am of the opinion that the ditch never was constructed the full depth of the original profile, through that deep cut, and that it had partially filled, also, from the fact that, just above the cut, the water in the ditch was about two feet deep, and they had lowered the ditch about a foot, by plowing the furrow through that point. The water would fill up the ditch above, until it was high enough to go through what cutting was there.

" *Q.* What difference was there between the highest point in this cutting in section 32 of the ditch, when you resurveyed it, and the lowest point of the ditch, in section 28 ?

"*A.* Do you mean the lowest point farther up the drain ?

" *Q.* I mean the lowest point of the drain.

"*A.* 1.76 feet.

" *Q.* And which was the highest ?

"*A.* It was the highest in this cut where the ridge was. The highest point was at station 64, just west of the east quarter post of section 32, and the lowest point was at station 74, and station 74 is between the west quarter post of section 33 and the northwest corner of section 33.

" *Q.* How much higher was the highest point of the cutting, in the section line between sections 32 and 33 and the lowest point west of the quarter post in section 28 ? You say 1.76 feet. Is that right ?

" *A.* I find that the upper end of the drain in section 28 is .1.3 feet higher than that ridge is at station 64. * * *

" *Q.* Will you tell us whether in your former testimony you mentioned the creek, stream, or swale, coming from section 4 in Denmark, and going north through section 33 in the township of Gilford, and where that stream joins the Squaw creek ?

" *A.* I mentioned it. It joins Squaw creek a little north of the west quarter post of section 33; that is, there was a stream of water which came from the southeast, and, I think, from the south part of section 33, and joined the other creek at that place, and that was a little north and east of the high point of land I have mentioned in section 32, and it was above it. * * *

" *Q.* From the east quarter post of section 32 to the upper end of the ditch, what, if any, stream of water did you notice between those points, at the time you made your first survey ?

" *A.* There was a good deal of water north of that quarter post, where it was seemingly the lowest. That

was about 80 rods north of the quarter post. We passed over that low ground to the higher, near the northwest corner of section 33; then we went easterly on the south side of the section line, to the low ground again, where the water passed over, and to the place where we turned north into section 28; and from the point where we turned to the north, for the most of the distance, it was low ground. At the time when I made the survey first, there was water in those low places, such as was natural to that class of swamp lands, but no defined or running stream there. There was nothing but the natural flow of the water over the surface to the southwest; that is, I mean east of the northwest corner of the section.

" *Q.* To what .extent did you find that the water at that time existed on the lands in sections 28 and 33 of Gilford ? I mean in the spring when you made your first survey, and every time after that, when you noticed it, until you struck the final stakes in August ?

"*A.* There was considerable water in the lower elevations. Sometimes it was boot-top high when I first surveyed it. When I reset the stakes, the water had nearly dried out of them. * * *

" *Q.* When you made the resurvey in 1899, was there any water going down the low lands from and off of section 28 of Gilford, and north or east of the southeast quarter of the northeast quarter of section 32, or north or east of the section line between sections 32 and 33, whether or not any water was going down through what you called the swale or low land in which you located this ditch in 1885 ?

"*A.* There was no water out of the ditch. It was dead, still water, and not going either way in the ditch.

" *Q.* Was there any water outside of the ditch, on either side of it, running either way ?

"*A.* I did not notice any water on the lands. It had drawn the water through the ridge and from the surface of the lands.

" *Q.* Where was this ridge ?

"*A.* West of the east quarter post of section 32.

" *Q.* Where does the ditch leave the low lands on the quarter line in section 32 ?

"*A.* Pretty near the center of section 32. * * * I said there were two feet of water in the ditch north of the east quarter post of section 32. They .had plowed a furrow through that ridge and lowered it; that is, lowered

the water. By doing that, the water ran down the ditch. The plow furrow was made in the ditch, through the ridge. * * *

"Q. The survey which you made of that ditch, if it was taken out and deepened, as you laid it out, would take that water all away, out of the ditch, above the ridge?

"A. Yes, sir. * * * The caving of the banks made them more perpendicular, and left the bottom of the drain much wider than the original; that is, as I found it at the time of the cleaning. * * *

"Q. Give me the altitude at stake 74, as found by you when you made your first survey in 1885.

"A. 8.68 feet.

"Q. How much is that elevation above the elevation that you have given me, as in the creek at stake 44, when you made the survey or took the levels for the cleaning out?

"A. It would be 3.45 feet.

"Q. The elevation, then, was sufficient so that all of the water would run off the surface of the ground, through the natural watercourse in sections 33 and 32, into the ditch at the point where you left the natural watercourse in the construction of the ditch at stake 44.

"A. It would be 3.45 feet.

"Q. What was the fall along the natural watercourse between those two points; that is, between stake 74 and stake 44, on the surface of the land?

"A. The original level was 88 hundredths of a foot. * * * I have a memorandum of the length of the drain as surveyed. It was 237 chains and 92 links, reducing that to miles and rods it would be 2 miles, 77 chains, and 92 links. * * *

"Q. Do you say that all of the water coming upon section 33, out of Denmark township, would have gone through section 32 to section 31 of Gilford, if Squaw Creek had not been cleaned out and improved according to your survey in 1899?

"A. I think it would. There might be some on the very extreme side of the section go north. We did not extend it, and there was no intention to enlarge it; but it was to be cleaned out, as near as we could get at it, to the original depth contemplated.

"Q. If it took all of the water that would accumulate on sections 28 and 33 as constructed before you did any work on it cleaning it out, why clean it out?

"*A*. Because it did not do the work contemplated in the original construction, and it left the lands so they could not cultivate them. I presume that the application for the cleaning was for that purpose, and I was employed to place the drain where it ought to have been in the first place. My judgment, independent of the object of the commissioner and of the petitioners, would be so that the water could be drained low enough, and the lands thereby made tillable. My instructions and object was to clean out the drain according to the original cuttings, regardless of what effect it might have on the lands at any point. Certainly the water which could not flow over the highest elevation would have to saturate the ground until it would evaporate."

Defendants' witness John Findlay testified:

"*Q*. Was it about six years ago that they cleaned out the Van Patten drain?

"*A*. It may have been 6, 8, or 10 years. There was an old drain there for years. It must have been there for 30 years, and the Van Patten drain was extended into that old drain. It was not made any larger, but it was made deeper. It was cleaned out, perhaps, as far as the old drain went. Where the drain was extended, the land was not wet. It has been cultivated for over 30 years. I suppose that the only object in deepening it was to enable them to tile their land. I think all of the land along the old ditch had been farmed for a great many years."

Defendants' witness Stewart testified:

"I do not think there is a section in the township but what has some water on it now.

"*Q*. Does there as much water stand on 28 as did before the ditch was cleaned out and deepened?

"*A*. I think not. And I do not think there is as much in section 33."

Defendants' witness Hepfer testified:

"*Q*. And yet you say that the making of Squaw Creek improvement drain would not increase the volume of water?

"*A*. Yes, sir; I said it. The water there goes down the small ditch, and you would not get any more of it by digging that ditch. What I mean is that there is about so much water to run down, and in seeking its level it

goes to the west, even though it goes slower now, or percolates through the ground. Probably in digging the Squaw Creek drain it would collect the water sooner and get rid of it quicker. The drain would be deeper. The volume of water would not be increased. The only difference that I can see that it might get down quicker. * * *

" Q. Since this ditching has been done through section 33, that swale you speak of there has been dried and the land has become tillable, has it not?

"A. The swale—where is the swale?

" Q. You know you have been talking about some low land in section 33. Since this ditching has been done, has any part of the land been improved, or all of it?

"A. The biggest share of it. * * * I have not been down that way since. There has been no change or extension in Squaw creek since the first digging; that is, it has not been extended any further north in section 28 of Gilford. The land in sections 28 and 33 of Gilford was middling wet before Squaw Creek drain was made. And that drain would have taken all the water away, if it had been dug according to specifications; but I do not think it was, as there were ups and downs in the grade of the bottom of the ditch. It does not take all the water out since it was cleaned out. It has made it some better, to be sure; but it has not dried it by any means."

Defendants' witness Sutliff testified:

" The Schemm drain was intended to clean out, deepen, and straighten the old watercourse. The length of the drain as laid is 94 chains and 90 links. * * *

"Q. Suppose the Ayers drain never had been established as a drain, what, then, was the outlet for the water that came down where the Weiss drain now is?

"A. It would be the same watercourse before it was deepened. It would be the same route, with some variations in cutting off the angles and straightening it somewhat; but it would be practically the same route as the Ayers drain.

"Q. Do you remember back to the time before the Reese creek was constructed into a drain, of the territory in section 17 traversed by that drain, and whether there was any watercourse there before the ditch was constructed in section 18?

"A. Yes, sir; I remember back further than that, and there was a watercourse there. The water ran over the

surface then.  *  *  *  The Reese Creek drain has been cleaned out, and when it was cleaned the first time, I had the entire control of it; but the next time it was cleaned under the county drain commissioner.  I mean that it has been cleaned out twice since it was first constructed as a drain.  The first time, when I cleaned it out, I simply took out the accumulated grass, flood wood, and the little obstructions occasioned by the banks caving in and such like. I am not sure whether I cleaned it out for the full length of the drain.  The second time, only the upper part of the drain was cleaned out; that is, across section 18.  *  *  * I thought, when I first came to that country, that the whole country was a swamp; but I find there is quite a difference.  I have changed my mind, and in looking at the land from the standpoint of my knowledge now of that country I say that there is no place within that Squaw Creek watershed in the township of Denmark that was at any time what would be called a swamp.  There were no lands that were not hard bottom lands.  There were no places where there were quicksand swamps that I know of.  *  *  *

"*Q.* Was the Pesick drain which you testified to as being a watercourse, cleaned out ?

"*A.* Yes; it gave a better drainage to the surface of the land.  It was all constructed before, but we deepened and improved it.  *  *  *

"*Q.* Isn't it a fact that the Pesick drain and the Schemm drain simply ran from the Reese drain in an easterly direction, and they were swales or dips of low land, and those ditches were made simply to drain those swales, and not to empty any swamps or to receive any water from any springs ?

"*A.* That is right.  *  *  *

"*Q.* I call your attention to all of the drains you have mentioned this morning, namely, Reese drain, Pesick drain, Schemm drain, Weiss drain, Ayers drain, and the Van Patten drain.  From your testimony, you seem to be quite familiar with all of them, and are able to give the width and flow of the water near the mouth of the Reese drain.  Now, at any time during wet seasons did any of those ditches overflow their banks at any place ?

"*A.* I do not know.  I never was there in extreme high water.  We never worked on the ditches in extreme high water.

" *Q.* Then, when you testified as to the flow of the water and the speed of the current, it was done when you saw it in a dry time, was it?

"*A.* I did not testify as to the speed of the water or anything of the kind, and I do not know whether any of those streams in time of high water overflow their banks.
\*   \*  ·  \*

" *Q.* From your knowledge of that particular vicinity, where did the water flow to from that point, before Reese drain was constructed in Reese creek?

"*A.* It flowed the same route of the Reese ditch, except the Reese ditch straightened some points of it, and it may have shortened the route; but it is practically the same route."

Defendants' witness Hannan testified concerning Squaw Creek drain:

" I think the drain was cleaned out about three years ago, and since it was cleaned out the water doesn't remain there so long, and I guess there doesn't so much stay in there."

Defendants' witness Abner Johnson testified:

" I suppose the statements contained in the petition for cleaning it out were true. At least, the reasons I gave for cleaning it out was to drain the water off. When it was first established, it did not take all the water off from section 28, and I think since it was cleaned out it furnishes drainage for my 25 acres. That was along the south side of my land. It extended for the distance of 40 rods from the southeast corner of my land, and it runs far enough to take in about 25 acres. It will take all the water off that 25 acres when I get drains cut out to the south section line, and I think the drain will take all the water that will flow on the south half of section 28.  \*   \*   \*

"*Q.* Then all of the land now in section 28, since this ditch has been cleaned out in 1900, is practically dry land and drains to the Squaw creek?

" *A.* I did not say so, I said the south half of section 28, excepting the part I have mentioned, drains into Squaw creek, and all of it is practically dry land now. In dry weather it is dry land, and the same is true of section 33 of Gilford. There was not good drainage before the ditch was cleaned out, but now it practically takes all of the water that comes on those sections."

Defendants' witness William Johnson testified:

" There was considerable water in times of heavy rains and from melting of snows and the like of that, in sections 28 and 33, before Squaw creek was constructed, and it could not get away as well as since.

" *Q.* Isn't it a fact that, before the ditch was dug, a good deal of the water had to soak away or evaporate?

" *A.* It made its way downstream as fast as it naturally could, for the stuff which laid in the creek or low places kept it from going. Since it has been cleaned out, the water runs away more rapidly than it did before. The water used to lay there for some time, until it could run away. It makes its way off now faster than it did, and since the ditch was cleaned out in 1899, there is but very little water stays in there; that is, it soon gets off the land.

" *Q.* Before they dug the ditch in 1885, and between that time and when they cleaned it out in 1900, after heavy rains or melting snow and ice, or in the springtime, how long would it take the water to get off of sections 28 and 33?

"*A.* Well, I suppose that would be owing to how long it rained; but, as a general thing, it takes four or five days to take the water all off the surface. On account of the culvert in there, and the other one, it cannot carry the water off of 28 and 33 as fast as it accumulates. The culvert between 28 and 33 is about 8 feet wide and three feet deep; and in time of heavy rains and high water, I suppose it runs full. Squaw Creek drain along the west side of the northwest quarter of 33 is about nine or ten feet wide on the top, and perhaps five feet on the bottom. The depth varies. It may have an average depth of five feet. At the time of heavy rain and high water, the capacity of the drain is taxed to its full extent. The water breaks through between sections 32 and 33 in the old watercourse.

" *Q.* Then you would say that, since the drain has been built and cleaned out, more water goes down in a short space of time than did before, because it takes it quicker.

"*A.* The surface water."

We have quoted from the testimony somewhat fully for the reason that it was strenuously insisted upon the argument by the able counsel for defendants that complainant had suffered no damage because of the various improve-

ments of the drains referred to, but that, on the contrary, such improvements had been a benefit, by diminishing the quantity of water which would flow down the natural waterways. Several witnesses support the counsel's contention by ingenious and plausible reasoning; but the facts as disclosed by the whole record do not support the claim. It is obvious that the deepening and straightening of old drains and the construction of new ones must have had some purpose, and it seems equally obvious that that purpose was to drain territory which theretofore was not properly drained. This result was actually produced, as disclosed by witnesses for defendants, and lands were, by reason of the improvements, drained and made cultivable, which previously had been wet and not fit for tillage. The bridges, highways, and culverts of complainant township were, during the period of the improvements, subjected to floods of water flowing with greater force and in greater quantity than immediately prior to those improvements. The improvements furnish an adequate cause for the injuries to complainant's roads and bridges, and the only adequate cause disclosed by the record. That old waterways were deepened and straightened and new ones constructed in part is undisputed, and it is clear from the testimony and in the light of common sense that such waterways, as improved, carried the waters coming to them faster and in greater quantities in a given time than they had theretofore. The defendants had a lawful right to clean out the old waterways or drains to the depth to which they were originally excavated. They did not have a lawful right to deepen them, and thereby cast larger quantities of water in shorter periods upon complainant's highways, bridges, and culverts, to its damage. *Smith* v. *Township of Eaton*, 138 Mich. 511; *Cranson* v. *Snyder*, 137 Mich. 340; *Finkbinder* v. *Ernst*, 126 Mich. 565; *O'Connor* v. *Hogan*, 140 Mich. 613; *Township of Swan Creek* v. *Brown*, 130 Mich. 382; *Breen* v. *Hyde*, 130 Mich. 1; *Township of Merritt* v. *Harp*, 131 Mich. 174; *Bruggink* v. *Thomas*, 125 Mich. 9. The waterways

were none the less artificial because the drain commissioners made use in large part of depressions and washed-out channels, where the storm and surface water flowed in a state of nature.   The natural waterways would not afford the desired drainage, and they were therefore changed into artificial waterways which would.

We think the suit was properly instituted in the circuit court for the county of Bay in chancery, and under our view of the testimony the complainant is entitled to relief.   *Davis* v. *Township of Frankenlust,* 118 Mich. 494; *Township of Merritt* v. *Harp,* supra.   The Squaw Creek drain, the Ayers, Pesick, Schemm, Weiss, and Ryan drains, were cleaned out or constructed, in whole or in part, under the supervision of the defendant Harp, and as to such drains, he is liable, under our decisions, to an action at law for any damage which may have resulted from his unlawful acts, and is subject to the control of a court of equity.   *Bruggink* v. *Thomas,* 125 Mich. 9. The Reese drain was cleaned out by Mr. Harp's predecessor, and, so far as the record discloses, he has done nothing to maintain this drain, unless it be to improve the drains connecting with it; and, upon restoring the branch drains to their previous condition, we think he will have fully discharged his obligations to complainant in this suit.   The same holding will apply to the Van Patten drain, with reference to which Mr. Harp has taken no action.   The Squaw Creek improvement drain, as we understand from the record, is the subject of a prior suit, which is still pending.

We do not find sufficient evidence in the record of any unlawful acts on the part of the other defendants, the highway commissioners, which resulted in injury to complainant, to justify a decree against them, and as to them the bill must be dismissed.   The complainant township is not entitled to recover in this suit for any damages to its highways, bridges, or culverts.   Such damages are not recoverable by the township, either at law or in equity.   *Township of Denver* v. *Booming Co.,* 51 Mich. 472; *Township*

*of Merritt* v. *Harp*, supra.    The complainant is entitled to a decree requiring the defendant Harp to restore the drains cleaned out or constructed under his supervision to the condition previously existing, by damming them at such points and to such height as will render them, as nearly as practicable, of the same capacity as they were prior to such construction or cleaning out, to the extent which such cleaning out deepened or widened the original excavation. If necessary, a reference may be had to a circuit court commissioner to take testimony to determine the points where dams should be constructed and the height thereof.

The complainant will recover costs against the defendant Harp.    The defendants Findlay and Dawson will recover costs against complainant.

Moore, C. J., and Carpenter, McAlvay, and Hooker, JJ., concurred.

### ON MOTION TO MODIFY DECREE AS TO COSTS.

Per Curiam.    The defendants Dawson and Findlay presented to the clerk of this court for taxation a bill of costs containing the following items:

| | | |
|---|---:|---:|
| Counsel fee on argument allowed by rule | $30 | 00 |
| Clerk's fee as allowed by rule | 6 | 00 |
| Paid clerk of circuit court for making return | 5 | 00 |
| Printing 1,198 pages of record, at 68 cents per page | 818 | 00 |
| Printing 251 pages of brief, at 68 cents per page | 170 | 68 |
| Copy of record for printer, 3,798 folios, at 5 cents per folio | 189 | 90 |
| Maps for the record | 20 | 00 |
| Large maps for use in court | 15 | 00 |
| Express on records and briefs | 2 | 00 |
| | $1,256 | 58 |

The clerk disallowed the last three items and taxed the costs at $1,219.58.    From this taxation complainant appealed, and now moves the court for an order modifying the decree and the allowance of costs taxed thereunder.

The principal issue in this case was as to the effect of the improvement of several old drains and the construction of certain new ones by the defendant Harp as county drain commissioner. The defendant highway commissioners denied in their answer that they had had anything to do with the construction of the public drains, and there was no testimony in the record to dispute this claim. They also denied that they had constructed any highway ditches which had any tendency to increase the volume of water flowing through the drains, and this court sustained their contention in that regard. The great bulk of the testimony on the part of the defense was introduced to maintain the contention of defendant Harp, which this court has held untenable. It was wholly unnecessary for the defendants Findlay and Dawson to put in any testimony, except as to the effect of the highway ditches constructed by them, and 50 pages of printed record would amply cover the substance of the testimony introduced by them upon this subject. A brief of 30 pages would have been sufficient to fully present their argument in this court. Through inadvertence, the court settled a decree giving them full costs.

The decree will be modified, so that the bill of costs as taxed by the clerk be amended by inserting 50 pages of record in place of 1,198, 30 pages of brief in place of 251, and 250 folios of copy of record in place of 3,798, to be taxed at the prices per page and folio specified.